# BLUM, COMMISSIONER OF THE NEW YORK STATE DEPARTMENT OF SOCIAL SERVICES, ET AL. *v.* YARETSKY ET AL.

No. 80–1952.   Argued March 24, 1982—Decided June 25, 1982

992

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, STEVENS, and O'CONNOR, JJ., joined. WHITE, J., filed an opinion concurring in the judgment, *ante*, p. 843. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 1012.

*Judith A. Gordon*, Assistant Attorney General of New York, argued the cause for petitioners. With her on the briefs were *Robert Abrams*, Attorney General, *Shirley Adelson Siegel*, Solicitor General, *Andrea G. Iason*, Assistant Attorney General, and *Peter H. Schiff*.

*John E. Kirklin* argued the cause for respondents. With him on the brief were *Kalman Finkel* and *David Goldfarb*.*

JUSTICE REHNQUIST delivered the opinion of the Court.

Respondents represent a class of Medicaid patients challenging decisions by the nursing homes in which they reside to discharge or transfer patients without notice or an opportunity for a hearing. The question is whether the State may be held responsible for those decisions so as to subject them to the strictures of the Fourteenth Amendment.

## I

Congress established the Medicaid program in 1965 as Title XIX of the Social Security Act, 42 U. S. C. § 1396 *et seq.* (1976 ed. and Supp. IV), to provide federal financial assist-

---

*\*Toby S. Edelman* filed a brief for the National Citizens' Coalition for Nursing Home Reform as *amicus curiae* urging affirmance.

ance to States that choose to reimburse certain medical costs incurred by the poor. As a participating State, New York provides Medicaid assistance to eligible persons who receive care in private nursing homes, which are designated as either "skilled nursing facilities" (SNF's) or "health related facilities" (HRF's).[1] The latter provide less extensive, and generally less expensive, medical care than the former.[2] Nursing homes chosen by Medicaid patients are directly reimbursed by the State for the reasonable cost of health care services, N. Y. Soc. Serv. Law § 367–a.1 (McKinney Supp. 1981).

An individual must meet two conditions to obtain Medicaid assistance. He must satisfy eligibility standards defined in terms of income or resources and he must seek medically necessary services. See 42 U. S. C. § 1396. To assure that the latter condition is satisfied,[3] federal regulations require each nursing home to establish a utilization review committee (URC) of physicians whose functions include periodically as-

---

[1] N. Y. Soc. Serv. Law § 365–a.2(b) (McKinney Supp. 1982). Title XIX requires as a condition to the receipt of federal funds that participating States provide financial assistance to eligible persons in need of "skilled nursing facility services." 42 U. S. C. §§ 1396a(a)(13)(B), 1396d(a)(4)(A) (1976 ed. and Supp. IV). Federal assistance is also available to States that choose to reimburse the cost of "intermediate care facility services." § 1396d(a)(15). See §§ 1396d(c), (f). New York regulations refer to facilities that provide the latter type of care as HRF's. 10 NYCRR § 414.1(a) (1981).

[2] Compare 10 NYCRR §§ 416.1–416.2 with §§ 421.1–421.2 (1978). The parties have stipulated that Medicaid reimbursement rates for HRF's are generally lower than those for SNF's. See App. 169, ¶ 12.

[3] Congress has provided that federal funds supplied to assist in reimbursing nursing home costs will be reduced unless the participating State provides for the periodic review of patient care "to safeguard against unnecessary utilization of such care and services and to assure that payments . . . are not in excess of reasonable charges consistent with efficiency, economy, and quality of care." 42 U. S. C. § 1396a(a)(30). See §§ 1396b(g)(1)(C), 1396b(i)(4), 1395x(k).

sessing whether each patient is receiving the appropriate level of care, and thus whether the patient's continued stay in the facility is justified.[4]   42 CFR §§ 456.305, 456.406 (1981). If the URC determines that the patient should be discharged or transferred to a different level of care, either more or less intensive, it must notify the state agency responsible for administering Medicaid assistance.[5]   42 CFR §§ 456.337(c), 456.437(d) (1981); 10 NYCRR §§ 416.9(f)(2), (3), 421.13(f)(2), (3) (1980).

At the time their complaint was filed, respondents Yaretsky and Cuevas were patients in the American Nursing Home, an SNF located in New York City.   Both were recipients of assistance under the Medicaid program.   In December 1975 the nursing home's URC decided that respondents did not need the care they were receiving and should be transferred to a lower level of care in an HRF.   New York City officials, who were then responsible for administering the Medicaid program in the city, were notified of this decision and prepared to reduce or terminate payments to the nursing home for respondents' care.   Following administrative hearings, state social service officials affirmed the decision to discontinue benefits unless respondents accepted a transfer to an HRF providing a reduced level of care.

Respondents then commenced this suit, acting individually and on behalf of a class of Medicaid-eligible residents of New

---

[4] These committees must be composed of private physicians who are not directly responsible for the patient whose care is being reviewed.   42 CFR §§ 456.306, 456.406 (1981).   Under New York law, the committee members may not be employed by the SNF or HRF and may not have a financial interest in any residential care facility.   10 NYCRR §§ 416.9(b)(2), 421.13(b)(2) (1980).

[5] If the committee determines that a discharge or transfer is called for, it must afford the patient's attending physician an opportunity to present his views, although the committee's decision ultimately is final.   42 CFR §§ 456.336(f), (h), 456.436(f), (i) (1981).   See 10 NYCRR §§ 731.11, 741.14 (1980).

York nursing homes.[6] Named as defendants were the Commissioners of the New York Department of Social Services and the Department of Health. Respondents alleged in part that the defendants had not afforded them adequate notice either of URC decisions and the reasons supporting them or of their right to an administrative hearing to challenge those decisions.[7] Respondents maintained that these actions violated their rights under state and federal law and under the Due Process Clause of the Fourteenth Amendment. They sought injunctive relief and damages.[8]

In January 1978 the District Court certified a class[9] and issued a preliminary injunction, restraining the defendants

---

[6] The class was defined to include patients "who have been, are or will be threatened or forced to leave their nursing homes and have their Medicaid benefits reduced or terminated as a result of 'Utilization Review' committee findings alleging that they are not eligible for the level of nursing home care they receive." App. 19, ¶ 1. The complaint also named as a plaintiff the New York chapter of the Gray Panthers, an organization that "has among its objectives the development of a health care system for the elderly which provides quality health care to all persons." Id., at 21, ¶ 5.

[7] The complaint also alleged that URC transfers to lower levels of care and corresponding reductions in Medicaid benefits were arbitrary and were caused by improperly constituted URC's that acted without adequate written criteria and failed to afford adequate notice either to the patients or their attending physicians.

[8] Ten individuals, who are also respondents in this Court, later intervened in the suit. Each intervenor was a resident of either an SNF or an HRF and had been the subject of a URC decision recommending transfer to a lower level of care. The intervenors all were afforded administrative hearings resulting in affirmance of petitioners' decisions to reduce or terminate Medicaid benefits if the intervenors did not follow URC recommendations.

[9] The class was defined to include "all persons who are residents in skilled nursing or intermediate care facilities in the State of New York and who, following utilization review recommendations and/or fair hearings, are determined by defendants to be ineligible to receive the level of care at the facilities in which they reside and to be subject to reduction or termination of their Medicaid benefits." Id., at 45.

from reducing or terminating Medicaid benefits without timely written notice to the patients, provided by state or local officials, of the reasons for the URC decision, the defendants' proposed action, and the patients' right to an evidentiary hearing and continued benefits pending administrative resolution of the claim. App. 100–101, ¶ 2.[10] The court's accompanying opinion relied primarily on existing federal and state regulations. *Id.*, at 112–115.

In March 1979 the District Court issued a pretrial order that identified a new claim raised by respondents that a panoply of procedural safeguards should apply to URC decisions transferring a patient to a *higher*, *i. e.*, more intensive, level of medical care, as well as to decisions recommending transfers to a lower level of care. In addition, respondents claimed that such safeguards were required prior to transfers of any kind initiated by the nursing homes themselves or by the patients' attending physicians. *Id.*, at 157, ¶ II(J); 166–167, ¶ II(J). Respondents asserted that all of these transfers deprived patients of interests protected by the Fourteenth Amendment and were the product of "state action." *Id.*, at 167, ¶ II(J).[11]

In October 1979 the District Court approved a consent judgment incorporating the relief previously awarded by the preliminary injunction and establishing additional substantive and procedural rights applicable to URC-initiated transfers to lower levels of care. *Id.*, at 227–239. The consent judgment left several issues of law to be decided by the District Court. The most important, for our purposes, was "whether there is state action and a constitutional right to

---

[10] The court also required the defendants to afford class members access to all pertinent case files and medical records. *Id.*, at 101–102. The Court of Appeals for the Second Circuit upheld portions of the injunction challenged by petitioners. *Yaretsky* v. *Blum*, 592 F. 2d 65 (1979).

[11] The pretrial order also redefined the class to include "all residents of skilled nursing and health related nursing facilities in New York State who are recipients of Medicaid benefits." App. 151.

a pre-transfer evidentiary hearing in a patient transfer to a higher level of care and/or a patient transfer initiated by the facility or its agents." *Id.*, at 234–235, ¶ VIII(A)(1). Ultimately, the District Court answered that question in respondents' favor, although without elaborating its reasons. *Id.*, at 240. The court permanently enjoined petitioners, as well as all SNF's and HRF's in the State, from permitting or ordering the discharge of class members, or their transfer to a different level of care, without providing advance written notice and an evidentiary hearing on "the validity and appropriateness of the proposed action." *Id.*, at 242–243.

The Court of Appeals for the Second Circuit affirmed that portion of the District Court's judgment we have described above. 629 F. 2d 817 (1980).[12] The court held that URC-initiated transfers from a lower level of care to a higher one, and all discharges and transfers initiated by the nursing homes or attending physicians, "involve state action affecting constitutionally protected property and liberty interests." *Id.*, at 820. The court premised its identification of state action on the fact that state authorities "responded" to the challenged transfers by adjusting the patients' Medicaid benefits. *Ibid.* Citing our opinion in *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345, 351 (1974), the court viewed this response as establishing a sufficiently close "nexus" between the State and either the nursing homes or the URC's to justify treating their actions as those of the State itself.

We granted certiorari to consider the Court of Appeals' conclusions about the nature of state action. 454 U. S. 815 (1981). We now reverse its judgment.

---

[12] The court modified the injunction by relieving petitioners of obligations that, in the opinion of federal authorities, would render the State ineligible for Medicaid funding. 629 F. 2d, at 822. The court also reversed the District Court's holding that state administrators were precluded by due process or state law from rejecting a hearing officer's recommendation favorable to a patient without reading a verbatim transcript of the hearing and the exhibits. *Id.*, at 822–825. This holding is not before us.

## II

We first address a question raised by petitioners regarding our jurisdiction under Art. III. They contend that respondents, who were threatened with URC-initiated transfers to lower levels of care, are without standing to object either to URC-initiated transfers to higher levels of care or to transfers of any kind initiated by nursing homes or attending physicians. According to petitioners, respondents obtained complete relief in the consent judgment approved by the District Court in October 1979, which afforded substantive and procedural rights to patients who are the subject of URC-initiated transfers to lower levels of care. Since they have not been threatened with transfers of any other kind, they have no standing to object, and the District Court consequently was without Art. III jurisdiction to enter its judgment.

It is axiomatic that the judicial power conferred by Art. III may not be exercised unless the plaintiff shows "that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors* v. *Village of Bellwood,* 441 U. S. 91, 99 (1979). It is not enough that the conduct of which the plaintiff complains will injure *someone.* The complaining party must also show that he is within the class of persons who will be concretely affected. Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject. See *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 166–167 (1972).

Respondents appear to recognize these principles, but contend that although the October 1979 consent judgment halted the implementation of adverse URC decisions recommending discharge or transfer to lower levels of care, the URC determinations themselves were left undisturbed. These determinations reflected the judgment of physicians, chosen by the

nursing homes, that respondents' continued stay in their facilities was not medically necessary. Consequently, respondents maintain that they are subject to the serious threat that the nursing home administrators will reach similar conclusions and will themselves initiate patient discharges or transfers without adequate notice or hearings. Petitioners belittle this suggestion, noting that the consent judgment permanently enjoined all New York nursing homes, as well as petitioners, from implementing URC transfers to lower levels of care; this injunction bars the nursing homes from adopting the URC decisions as their own. Petitioners concede, however, that the consent judgment permits the nursing homes and respondents' attending physicians to decide independently to initiate transfers.

We conclude that the threat of facility-initiated discharges or transfers to lower levels of care is sufficiently substantial that respondents have standing to challenge their procedural adequacy. In reaching this conclusion, we are mindful of "the primary conception that federal judicial power is to be exercised . . . only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action." *Poe* v. *Ullman*, 367 U. S. 497, 504 (1961). Of course, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief." *Pennsylvania* v. *West Virginia*, 262 U. S. 553, 593 (1923), quoted in *Babbitt* v. *Farm Workers*, 442 U. S. 289, 298 (1979). "[T]he question becomes whether any perceived threat to respondents is sufficiently real and immediate to show an existing controversy . . . ." *O'Shea* v. *Littleton*, 414 U. S. 488, 496 (1974). Even accepting petitioners' characterization of the scope of the permanent injunction embodied in the consent judgment, the nursing homes in which respondents reside remain free to determine independently that respondents' continued stay at current levels of care is not medically necessary. The possibility that they will do so is not "imaginary or speculative." *Younger* v. *Harris*, 401

U. S. 37, 42 (1971). In light of similar determinations already made by the committee of physicians chosen by the facilities to make such assessments, the threat is quite realistic. See *O'Shea* v. *Littleton, supra,* at 496 ("past wrongs are evidence bearing on whether there is real and immediate threat of repeated injury").

We cannot conclude, however, that the threat of transfers to *higher* levels of care, whether initiated by the URC's, the nursing homes, or attending physicians, is "of sufficient immediacy and reality," *Golden* v. *Zwickler,* 394 U. S. 103, 108 (1969), that respondents have standing to seek an adjudication of the procedures attending such transfers. Nothing in the record available to this Court suggests that any of the individual respondents have been either transferred to more intensive care or threatened with such transfers. It is not inconceivable that respondents will one day confront this eventuality, but assessing the possibility now would "tak[e] us into the area of speculation and conjecture." *O'Shea* v. *Littleton, supra,* at 497.[13]

Moreover, the conditions under which such transfers occur are sufficiently different from those which respondents do have standing to challenge that any judicial assessment of their procedural adequacy would be wholly gratuitous and advisory. Transfers to higher levels of care are recommended when the patient's medical needs cannot be satisfied by the facility in which he or she currently resides. Al-

---

[13] Respondents suggest that members of the class they represent have been transferred to higher levels of care as a result of URC decisions. Respondents, however, "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth* v. *Seldin,* 422 U. S. 490, 502 (1975). Unless these individuals "can thus demonstrate the requisite case or controversy between themselves personally and [petitioners], 'none may seek relief on behalf of himself or any other member of the class.' *O'Shea* v. *Littleton,* 414 U. S. 488, 494 (1974)." *Ibid.*

though respondents contend that all transfers threaten elderly patients with physical or psychological trauma, one may infer that *refusal* to accept a transfer to a higher level of care could itself be a decision with potentially traumatic consequences. The same cannot be said of discharges or transfers to less intensive care. In addition, transfers to more intensive care typically result in an *increase* in Medicaid benefits to match the increased cost of medically necessary care. Respondents' constitutional attack on discharges or transfers to a lower level of care presupposes a *deprivation* of protected property interests. Finally, since July 1978, petitioners have adhered to a policy permitting Medicaid patients to refuse URC-recommended transfers to higher levels of care without jeopardizing their Medicaid benefits. App. 180, ¶ 56. No similar policy was in force with respect to other transfers until the District Court mandated its adoption.

We conclude, therefore, that although respondents have standing to challenge facility-initiated discharges and transfers to lower levels of care, the District Court exceeded its authority in adjudicating the procedures governing transfers to higher levels of care. We turn now to the "state action" question presented by petitioners.

## III

The Fourteenth Amendment of the Constitution provides in part that "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." Since this Court's decision in the *Civil Rights Cases*, 109 U. S. 3 (1883), "the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States." *Shelley* v. *Kraemer*, 334 U. S. 1, 13 (1948). "That Amendment erects no shield against merely private conduct, however discriminatory or wrongful." *Ibid.* See *Jackson* v. *Metropolitan Edison Co.*, 419

U. S. 345 (1974); *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144 (1970).

Faithful adherence to the "state action" requirement of the Fourteenth Amendment requires careful attention to the gravamen of the plaintiff's complaint. In this case, respondents objected to the involuntary discharge or transfer of Medicaid patients by their nursing homes without certain procedural safeguards.[14] They have named as defendants state officials responsible for administering the Medicaid program in New York. These officials are also responsible for regulating nursing homes in the State, including those in which respondents were receiving care. But respondents are not challenging particular state regulations or procedures, and their arguments concede that the decision to discharge or transfer a patient originates not with state officials, but with nursing homes that are privately owned and operated. Their lawsuit, therefore, seeks to hold state officials liable for the actions of private parties, and the injunctive relief they have obtained requires the State to adopt regulations that will prohibit the private conduct of which they complain.

A

This case is obviously different from those cases in which the defendant is a private party and the question is whether his conduct has sufficiently received the imprimatur of the State so as to make it "state" action for purposes of the Fourteenth Amendment. See, *e. g., Flagg Bros., Inc.* v. *Brooks*, 436 U. S. 149 (1978); *Jackson* v. *Metropolitan Edison Co., supra; Moose Lodge No. 107* v. *Irvis*, 407 U. S. 163 (1972);

---

[14] "From the beginning of this lawsuit the respondents' challenge has been to the involuntary discharge or transfer of Medicaid patients from and by their nursing facilities without adequate safeguards .... Thus, the claim before this Court is whether state action attaches to a *nursing facility's summary discharge or transfer of the patient* ...." Brief for Respondents 21–22 (emphasis in original).

*Adickes* v. *S. H. Kress & Co., supra.* It also differs from other "state action" cases in which the challenged conduct consists of enforcement of state laws or regulations by state officials who are themselves parties in the lawsuit; in such cases the question typically is whether the private motives which triggered the enforcement of those laws can fairly be attributed to the State. See, *e. g., Peterson* v. *City of Greenville,* 373 U. S. 244 (1963). But both these types of cases shed light upon the analysis necessary to resolve the present case.

First, although it is apparent that nursing homes in New York are extensively regulated, "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." *Jackson* v. *Metropolitan Edison Co.,* 419 U. S., at 350. The complaining party must also show that "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.,* at 351. The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains. The importance of this assurance is evident when, as in this case, the complaining party seeks to hold the State liable for the actions of private parties.

Second, although the factual setting of each case will be significant, our precedents indicate that a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. *Flagg Bros., Inc.* v. *Brooks, supra,* at 166; *Jackson* v. *Metropolitan Edison Co., supra,* at 357; *Moose Lodge No. 107* v. *Irvis, supra,* at 173; *Adickes* v. *S. H. Kress & Co., supra,* at 170. Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those

initiatives under the terms of the Fourteenth Amendment. See *Flagg Bros., supra,* at 164–165; *Jackson* v. *Metropolitan Edison Co., supra,* at 357.

Third, the required nexus may be present if the private entity has exercised powers that are "traditionally the exclusive prerogative of the State." *Jackson* v. *Metropolitan Edison Co., supra,* at 353; see *Flagg Bros., Inc.* v. *Brooks, supra,* at 157–161.

## B

Analyzed in the light of these principles, the Court of Appeals' finding of state action cannot stand. The court reasoned that state action was present in the discharge or transfer decisions implemented by the nursing homes because the State responded to those decisions by adjusting the patient's Medicaid benefits. Respondents, however, do not challenge the adjustment of benefits, but the discharge or transfer of patients to lower levels of care without adequate notice or hearings. That the State responds to such actions by adjusting benefits does not render it *responsible* for those actions. The decisions about which respondents complain are made by physicians and nursing home administrators, all of whom are concededly private parties. There is no suggestion that those decisions were influenced in any degree by the State's obligation to adjust benefits in conformity with changes in the cost of medically necessary care.

Respondents do not rest on the Court of Appeals' rationale, however. They argue that the State "affirmatively commands" the summary discharge or transfer of Medicaid patients who are thought to be inappropriately placed in their nursing facilities. Were this characterization accurate, we would have a different question before us. However, our review of the statutes and regulations identified by respondents does not support respondents' characterization of them.

As our earlier summary of the Medicaid program explained, a patient must meet two essential conditions in order to obtain financial assistance. He must satisfy eligibility cri-

teria defined in terms of income and resources and he must seek medically necessary services. 42 U. S. C. § 1396. To assure that nursing home services are medically necessary, federal law requires that a physician so certify at the time the Medicaid patient is admitted and periodically thereafter. 42 U. S. C. § 1396b(g)(1) (1976 ed. and Supp. IV). New York requires that the physician complete a "long term care placement form" devised by the Department of Health, called the DMS–1. 10 NYCRR §§ 415.1(a), 420.1(b) (1980). A completed form provides, *inter alia*, a numerical score corresponding to the physician's assessment of the patient's mental and physical health. As petitioners note, however, the physicians, and not the forms, make the decision about whether the patient's care is medically necessary.[15] A physician can authorize a patient's admission to a nursing facility despite a "low" score on the form. See 10 NYCRR §§ 415.1(a)(2), 420.1(b)(2) (1978).[16] We cannot say that the

---

[15] A completed DMS–1 form provides a summary of the patient's medical condition. Five of the eleven questions devoted to this subject require the assignment of numerical values. See 10 NYCRR App. C–1 (1978). A range of numerical values to be used in completing these questions are set forth in a second form, called the DMS–9. See *ibid.* The dissent's discussion of the DMS–9 suggests that completion of the DMS–1 form is a purely mechanical exercise that does not require the exercise of independent medical judgment. The dissent's discussion is incomplete. The other six questions on the DMS–1 ask the physician such questions as whether the patient requires daily supervision by a registered nurse, whether complications would arise without skilled nursing care, whether a program of therapy is necessary, and if so what kind, whether the patient should be considered for different levels of care, and whether the patient is medically qualified for the level of care he or she is receiving. The physician brings to bear his own medical judgment in answering these questions; their placement on the form would be inexplicable if the numerical scores were dispositive.

[16] The dissent belittles this fact by noting that the decision to depart from the form in admitting a patient is made by a physician member of the nursing home's URC, and that such persons are "part and parcel of the statutory cost control process." *Post*, at 1022. This signifies nothing more

State, by requiring completion of a form, is responsible for the physician's decision.

In any case, respondents' complaint is about nursing home decisions to discharge or transfer, not to admit, Medicaid patients. But we are not satisfied that the State is responsible for those decisions either.[17] The regulations cited by respondents require SNF"s and HRF"s "to make all efforts possible to transfer patients to the appropriate level of care or

---

than the fact, disputed by no one, that the State requires utilization review in order to reduce unnecessary Medicaid expenditures. It remains true that physician members of the URC's are not employed by the State and, more important, render medical judgments concerning the patient's health needs that the State does not prescribe and for which it is not responsible. We must also emphasize, of course, that we are ultimately concerned with decisions to transfer patients who have already been admitted.

Apropos of this relevant issue, the dissent observes, *post,* at 1023, that once a patient has been admitted, the State requires, as a condition to the disbursement of Medicaid funds, that within five days after admission the nursing home operator assess the patient's status according to standards contained in the DMS–1 and DMS–9 forms. As the dissent is also aware, *post,* at 1023, n. 10, a physician member of the URC has the power to determine that the patient needs the level of care he is receiving despite an adverse score on the DMS–1. 10 NYCRR §§ 416.9(a)(2)(i), 421.13(a)(2)(i) (1980). That decision, rendered after consultation with the patient's attending physician, is purely a medical judgment for which the State, as before, is not responsible.

[17] The dissent condemns us for conducting a "cursory" review of the regulations governing utilization review, *post,* at 1019, and pointedly asks "where . . . is the Court's discussion of the frequent utilization reviews that occur *after* admission?" *Post,* at 1024. The dissent, in its headlong dive into the sea of state regulations, forgets that patient transfers to lower levels of care initiated by utilization review committees are simply not part of this case. As we noted earlier, such transfers were the subject of a consent judgment in October 1979. We are concerned only with transfers initiated by the patients' attending physicians or the nursing home administrators themselves. Therefore, we have focused on regulations that concern decisions which are not the product of URC recommendations. As we explain in the text, those regulations do not demonstrate that the State is responsible for the transfers with which we are concerned.

home as indicated by the patient's medical condition or needs," 10 NYCRR §§ 416.9(d)(1), 421.13(d)(1) (1980).[18] The nursing homes are required to complete patient care assessment forms designed by the State and "provide the receiving facility or provider with a current copy of same at the time of discharge to an alternate level of care facility or home." 10 NYCRR §§ 416.9(d)(4), 421.13(d)(4) (1980).

These regulations do not require the nursing homes to rely on the forms in making discharge or transfer decisions, nor do they demonstrate that the State is responsible for the decision to discharge or transfer particular patients. Those decisions ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State.[19] This case, therefore, is not unlike

---

[18] Federal regulations also require SNF's and HRF's to obtain from admitting physicians a plan of discharge for each patient. 42 CFR §§ 456.280 (b)(6), 456.380(b)(6) (1981). State regulations require that nursing home staff members assist in the preparation of these plans, which are designed to summarize "the patient's potential for return to the community, for transfer to another more appropriate setting or for achieving or maintaining the best obtainable level of function in the nursing home." 10 NYCRR §§ 416.1(k)(2)(ii), 421.3(b)(2) (1976). These requirements hardly make the State responsible for actual decisions to discharge or transfer particular patients.

[19] The dissent characterizes as "factually unfounded," post, at 1014, our conclusion that decisions initiated by nursing homes and physicians to transfer patients to lower levels of care ultimately depend on private judgments about the health needs of the patients. It asserts that different levels of care exist only because of the State's desire to save money, and that the same interest explains the requirement that nursing homes transfer patients who do not need the care they are receiving. Post, at 1014–1019. We do not suggest otherwise. Transfers to lower levels of care are not mandated by the patients' health needs. But they occur only after an assessment of those needs. In other words, although "downward" transfers are made possible and encouraged for efficiency reasons, they can occur only after the decision is made that the patient does not need the care he or she is currently receiving. The State is simply not responsible for *that* decision, although it clearly responds to it. In concrete terms, therefore, if a par-

*Polk County* v. *Dodson*, 454 U. S. 312 (1981), in which the question was whether a public defender acts "under color of" state law within the meaning of 42 U. S. C. § 1983 when representing an indigent defendant in a state criminal proceeding.[20] Although the public defender was employed by the State and appointed by the State to represent the respondent, we concluded that "[t]his assignment entailed functions and obligations in no way dependent on state authority." *Id.*, at 318. The decisions made by the public defender in the course of representing his client were framed in accordance with professional canons of ethics, rather than dictated by any rule of conduct imposed by the State. The same is true of nursing home decisions to discharge or transfer particular patients because the care they are receiving is medically inappropriate.[21]

Respondents next point to regulations which, they say, impose a range of penalties on nursing homes that fail to discharge or transfer patients whose continued stay is inappropriate. One regulation excludes from participation in the

---

ticular patient objects to his transfer to a different nursing facility, the "fault" lies not with the State but ultimately with the judgment, made by concededly private parties, that he is receiving expensive care that he does not need. That judgment is a medical one, not a question of accounting.

[20] This case, of course, does not involve the "under color of law" requirement of § 1983. Nevertheless, it is clear that the reasoning employed in *Polk County* is equally applicable to "state action" cases such as this one.

[21] Respondents also point to statutes requiring the State periodically to send medical review teams to conduct on-site inspections of all SNF's and HRF's. During these inspections, state employees are required to review the appropriateness of each patient's continued stay in the facility and to report their findings to the nursing home and the agency responsible for administering the Medicaid program in the State. 42 U. S. C. §§ 1396a(a) (26), (31), 1396b(g)(1)(D) (1976 ed. and Supp. IV). See 42 CFR § 456.611 (1981). Petitioners concede that these inspections can result in a discharge or transfer directed by state health officials. As they correctly argue, however, transfers of this kind are not the subject of respondents' complaint and none are presented by the record.

Medicaid program health care providers who "[f]urnished items or services that are substantially in excess of the beneficiary's needs." 42 CFR § 420.101(a)(2) (1981). The State is also authorized to fine health care providers who violate applicable regulations. 10 NYCRR § 414.18 (1978). As we have previously concluded, however, those regulations themselves do not dictate the decision to discharge or transfer in a particular case. Consequently, penalties imposed for violating the regulations add nothing to respondents' claim of state action.

As an alternative position, respondents argue that even if the State does not command the transfers at issue, it reviews and either approves or rejects them on the merits. The regulations cited by respondents will not bear this construction. Although the State requires the nursing homes to complete patient care assessment forms and file them with state Medicaid officials, 10 NYCRR §§ 415.1(a), 420.1(b) (1978), and although federal law requires that state officials review these assessments, 42 CFR §§ 456.271, 456.372 (1981), nothing in the regulations authorizes the officials to approve or disapprove decisions either to retain or discharge particular patients, and petitioners specifically disclaim any such responsibility. Instead, the State is obliged to approve or disapprove continued payment of Medicaid benefits after a change in the patient's need for services. See 42 CFR § 435.916 (1981). Adjustments in benefit levels in response to a decision to discharge or transfer a patient does not constitute approval or enforcement of that decision. As we have already concluded, this degree of involvement is too slim a basis on which to predicate a finding of state action in the decision itself.

Finally, respondents advance the rather vague generalization that such a relationship exists between the State and the nursing homes it regulates that the State may be considered a joint participant in the homes' discharge and transfer of Medicaid patients. For this proposition they rely upon

*Burton* v. *Wilmington Parking Authority*, 365 U. S. 715 (1961). Respondents argue that state subsidization of the operating and capital costs of the facilities, payment of the medical expenses of more than 90% of the patients in the facilities, and the licensing of the facilities by the State, taken together convert the action of the homes into "state" action. But accepting all of these assertions as true, we are nonetheless unable to agree that the State is responsible for the decisions challenged by respondents. As we have previously held, privately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated, do not fall within the ambit of *Burton*. *Jackson* v. *Metropolitan Edison Co.*, 419 U. S., at 357–358. That programs undertaken by the State result in substantial funding of the activities of a private entity is no more persuasive than the fact of regulation of such an entity in demonstrating that the State is responsible for decisions made by the entity in the course of its business.

We are also unable to conclude that the nursing homes perform a function that has been "traditionally the exclusive prerogative of the State." *Jackson* v. *Metropolitan Edison Co.*, *supra*, at 353. Respondents' argument in this regard is premised on their assertion that both the Medicaid statute and the New York Constitution make the State responsible for providing every Medicaid patient with nursing home services. The state constitutional provisions cited by respondents, however, do no more than authorize the legislature to provide funds for the care of the needy. See N. Y. Const., Art. XVII, §§ 1, 3. They do not mandate the provision of any particular care, much less long-term nursing care. Similarly, the Medicaid statute requires that the States provide funding for skilled nursing services as a condition to the receipt of federal moneys. 42 U. S. C. §§ 1396a(a)(13)(B), 1396d(a)(4)(A) (1976 ed. and Supp. IV). It does not require that the States provide the services themselves. Even if respondents' characterization of the State's duties were cor-

rect, however, it would not follow that decisions made in the day-to-day administration of a nursing home are the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public. Indeed, respondents make no such claim, nor could they.

## IV

We conclude that respondents have failed to establish "state action" in the nursing homes' decisions to discharge or transfer Medicaid patients to lower levels of care.[22] Consequently, they have failed to prove that petitioners have violated rights secured by the Fourteenth Amendment. The contrary judgment of the Court of Appeals is accordingly

*Reversed.*

[For opinion of JUSTICE WHITE concurring in the judgment, see *ante*, p. 843.]

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

If the Fourteenth Amendment is to have its intended effect as a restraint on the abuse of state power, courts must be sensitive to the manner in which state power is exercised. In an era of active government intervention to remedy social ills, the true character of the State's involvement in, and coercive influence over, the activities of private parties, often through complex and opaque regulatory frameworks, may not always be apparent. But if the task that the Fourteenth Amendment assigns to the courts is thus rendered more burdensome, the courts' obligation to perform that task faithfully, and consistently with the constitutional purpose, is rendered more, not less, important.

---

[22] As a postscript to their "state action" arguments, respondents suggest that this Court avoid the issue by holding that federal and state statutes and regulations require the procedural safeguards which they seek. The lower courts did not pass on this assertion, and we decline to do so as well.

In deciding whether "state action"[1] is present in the context of a claim brought under 42 U. S. C. § 1983 (1976 ed., Supp. IV), the ultimate determination is simply whether the § 1983 defendant has brought the force of the State to bear against the § 1983 plaintiff in a manner the Fourteenth Amendment was designed to inhibit. Where the defendant is a government employee, this inquiry is relatively straightforward. But in deciding whether "state action" is present in actions performed directly by persons other than government employees, what is required is a realistic and delicate appraisal of the State's involvement in the total context of the action taken. "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715, 722 (1961). See *Lugar* v. *Edmondson Oil Co.*, *ante*, at 939–942.[2] The Court today departs from the *Burton* precept, ignoring the

---

[1] As the Court noted in *Lugar* v. *Edmondson Oil Co.*, *ante*, at 926–932, the state action necessary to support a claimed violation of the Fourteenth Amendment, and the action "under color of law" required by 42 U. S. C. § 1983 (1976 ed., Supp. IV), represent parallel avenues of inquiry in a case claiming a remedy under § 1983 for a violation of the Fourteenth Amendment's Due Process Clause. Of course, the "color of law" inquiry required by § 1983 focuses directly on the question whether the conduct of the particular § 1983 defendant is sufficiently connected with the state action that is present whenever the constitutionality of a state law, regulation, or practice is properly challenged. But this question may just as easily be framed as whether the § 1983 defendant is a "state actor."

[2] In *Lugar*, we addressed a decidedly different question of "state action." In that case, the § 1983 plaintiff sought damages against a private party who had availed himself of an unconstitutional state attachment procedure, and had enlisted the aid of government officials to impair plaintiff's property for his own benefit. We concluded that "a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment." *Ante*, at 941. Here the State affirmatively relies upon and requires private parties to implement specific deprivations of benefits according to standards and procedures that the State has established and enforces for its own benefit. The imprint of state power on the private party's actions would seem in this circumstance to be even more significant.

nature of the regulatory framework presented by this case in favor of the recitation of abstract tests and a pigeonhole approach to the question of state action. But however correct the Court's tests may be in the abstract, they are worth nothing if they are not faithfully applied. Bolstered by its own preconception of the decisionmaking process challenged by respondents, and of the relationship between the State, the nursing home operator, and the nursing home resident, the Court subjects the regulatory scheme at issue here to only the most perfunctory examination. The Court thus fails to perceive the decisive involvement of the State in the private conduct challenged by the respondents.

## I

### A

The Court's analysis in this case is simple, but it is also demonstrably flawed, for it proceeds upon a premise that is factually unfounded. The Court first describes the decision to transfer a nursing home resident from one level of care to another as involving nothing more than a physician's independent assessment of the appropriate medical treatment required by that resident. Building upon that factual premise, the Court has no difficulty concluding that the State plays no decisive role in the transfer decision: By reducing the resident's benefits to meet the change in treatment prescribed, the State is simply responding to "medical judgments made by private parties according to professional standards that are not established by the State." *Ante,* at 1008. If this were an accurate characterization of the circumstances of this case, I too would conclude that there was no "state action" in the nursing home's decision to transfer. A doctor who prescribes drugs for a patient on the basis of his independent medical judgment is not rendered a state actor merely because the State may reimburse the patient in different amounts depending upon which drug is prescribed.

But the level-of-care decisions at issue in this case, even when characterized as the "independent" decision of the nurs-

ing home, see *ante*, at 1000, have far less to do with the exercise of independent professional judgment than they do with the *State's* desire to save money. To be sure, standards for implementing the level-of-care scheme established by the Medicaid program are framed with reference to the underlying purpose of that program—to provide needed medical services. And not surprisingly, the State relies on doctors to implement this aspect of its Medicaid program. But the idea of two mutually exclusive levels of care—skilled nursing care and intermediate care—embodied in the federal regulatory scheme and implemented by the State, reflects no established medical model of health care. On the contrary, the two levels of long-term institutionalized care enshrined in the Medicaid scheme are legislative constructs, designed to serve governmental cost-containment policies.

The fiscal underpinning of the level-of-care determinations at issue here are apparent from the legislative history of the "intermediate care" concept. In 1967, Congress was concerned with the increasing costs of the Medicaid program. Congress' motivation in establishing a program of reimbursement for care in intermediate-care facilities flowed directly from these fiscal concerns. Thus the Senate Finance Committee Report on the Social Security Amendments of 1967, S. Rep. No. 744, 90th Cong., 1st Sess., 188 (1967), expressed concern with the fact that only skilled nursing care was available under Medicaid: "[B]ecause of a decided financial advantage to a State under present matching formulas," States tended to classify recipients as in need of "'skilled nursing home' care." As a consequence, the Report noted, "a strong case exists for introducing another level of care for which vendor payments would be available." *Ibid.* The result was an amendment to Title XI of the Social Security Act, creating a new treatment track for "categorically needy" medicaid patients, called "intermediate care." As summarized on the Senate floor:

> "The committee bill would provide for a vendor payment in behalf of persons . . . who are living in facilities

which are more than boarding houses but which are less than skilled nursing homes. The rate of Federal sharing for payments for care in those institutions would be at the same rate as for medical assistance under title XIX. Such homes would have to meet safety and sanitation standards comparable to those required for nursing homes in a given state.

*"This provision should result in a reduction in the cost of title XIX by allowing States to relocate substantial numbers of welfare recipients who are now in skilled nursing homes in lower cost institutions."* 113 Cong. Rec. 32599 (1967) (emphasis added).

To implement this cost-saving mechanism, the Federal Government has required States participating in the Medicaid Program to establish elaborate systems of periodic "utilization review."[3] With respect to patients whose expenses are not reimbursed through Medicaid, these attempts to assign the patient to one of two mutually exclusive "levels of care" would be anomalous. While the criteria used to determine which patients require the services of "skilled-nursing facilities," which require "intermediate care facilities," and which require no long-term institutional care at all, obviously have a medical nexus, those criteria are not geared to the

---

[3] The State must provide for the periodic review of patient care "to safeguard against unnecessary utilization of such care and services and to assure that payments . . . are not in excess of reasonable charges consistent with efficiency, economy, and quality of care." 42 U. S. C. § 1396a(a)(30). See 42 U. S. C. §§ 1395x(k), 1396a(a)(31), 1396b(g)(1)(C) (1976 ed. and Supp. IV); 42 CFR §§ 456.305, 456.406 (1981). There is no need here to dwell on the very detailed federal requirements, except to note that if the State fails to ensure that the physician certifications and utilization review procedures are implemented for each patient in each facility, the State is subject to a loss of Medicaid funds commensurate with the extent of the failure to ensure such utilization review. See 42 U. S. C. §§ 1396b(g), (i)(4) (1976 ed. and Supp. IV); 42 CFR §§ 456.650–456.657 (1981).

specific needs of particular residents as determined by a physician; the level-of-care determination is *not* analogous to choosing specific medication or rehabilitative services needed by a nursing home patient. The inherent imprecision of using two broad levels to classify facilities and residents has been noted by the commentators.[4] The vigor with which these reviews are performed in the nursing home context, see *infra*, at 1022–1024, is extraordinarily *un*medical in character. From a purely medical standpoint, the idea of shifting nursing home residents from a "higher level of care" to a "lower level of care," which almost invariably involves transfer from one facility to another, rarely makes sense. As one commentator has observed: "These transfers eject helpless, disoriented people from the places they have lived for months or even years to facilities, not of their own choosing, that they have never seen before. The evidence is overwhelming that, without extraordinary preparatory efforts that are hardly ever made, *any* move is harmful for the preponderance of the frail elderly." B. Vladeck, Unloving Care 140 (1980).

The arbitrariness of the statutory system of treatment levels is evident from a comparison of the proportion of nursing home residents in skilled nursing facilities (SNF's) and those in intermediate care facilities (ICF's) in different States. A 1973 survey of 32 States revealed that 47.9% of Medicaid patients were in SNF's, 52.1% were in ICF's. But the proportion of SNF and ICF beds varied enormously from State to State. For example, less than 10% of Medicaid recipients receiving long-term institutional care in States such as Louisiana, Maine, Oregon, and Virginia were in SNF's; the number housed in SNF's in New York and Pennsylvania was nearly 80%, and in Florida and Georgia the figure was closer

---

[4] See, *e. g.*, Bishop, Plough, & Willemain, Nursing Home Levels of Care: Problems and Alternatives, 2 Health Care Financing Rev., No. 2, pp. 33, 36 (1980).

to 90%.[5]  Quite obviously, the answer to this disparity lies not in medical considerations or judgments, but rather in the varying fiscal policies, and the vigor of enforcement, in the participating States.

In New York, the nursing home operator is required to "maintain a discharge planning program to . . . document that the facility *has made and is continuing to make all efforts possible to transfer patients to the appropriate level of care or home as indicated by the patient's medical condition or needs.*"  10 NYCRR § 416.9(d)(1) (1980) (emphasis added).  See also § 421.13(d)(1).[6]  The responsibility the State assigns to nursing home operators to transfer patients to appropriate levels of care is, of course, designed primarily to implement the State's goal of reducing Medicaid costs,[7] and the termination or reduction of benefits follows forthwith upon the facility's discharge or transfer of a resident.  As the court below noted: "The state has, in essence, delegated a de-

---

[5] See B. Vladeck, Unloving Care 138 (1980).  "There is no reason to believe that Medicaid recipients in Georgia or Pennsylvania are ten times as likely to need skilled care as those in Oklahoma or Oregon, but they are ten times as likely to get it, or at least to get something called 'skilled care.'" *Id.*, at 137.

[6] If the nursing home fails to assign the patients to the level of care the State deems appropriate, it is subject to sanction.  Federal regulations provide that health care providers who furnish "items or services that are substantially in excess of the beneficiary's needs" may be excluded from participating in the program.  42 CFR § 420.101(a)(2) (1981).  A nursing home that fails to follow state regulations is also subject to state-imposed daily penalties.  See 10 NYCRR § 414.18 (1978).

It is also clear that under the federal scheme, the State's responsibility extends to ensuring proper assessment of every resident.  See 42 U. S. C. §§ 1396a(26)(A), 1396a(31)(A), 1396b(g)(1)(D) (1976 ed. and Supp. IV).

[7] To acknowledge that the active system of utilization review serves a primarily fiscal purpose is not to demean the importance of that purpose, or the extent of overplacement of Medicaid recipients in skilled nursing facilities.  That figure has been variously estimated at 10 to 40 percent.  See Bishop, Plough, & Willemain, *supra* n. 4.

cision to . . . reduce a public assistance recipient's benefits to a 'private' party," 629 F. 2d 817, 820 (CA2 1980), by assigning to that private party the responsibility to determine the recipient's need. But we should not rely on that fact alone in evaluating the nexus between the State and the challenged private action. Here the State's involvement clearly extends to supplying the standards to be used in making the delegated decision.

### B

Ignoring the State's fiscal interest in the level-of-care determination, the Court proceeds to a cursory, and misleading, discussion of the State's involvement in the assignment of residents to particular levels of care. In my view, an accurate and realistic appraisal of the procedures actually employed in the State of New York leaves no doubt that not only has the State established the system of treatment levels and utilization review in order to further its own fiscal goals, but that the State prescribes with as much precision as is possible the standards by which individual determinations are to be made.

The Court notes that at the time of admission the admitting physician is required to complete a long-term placement form called the DMS–1. 10 NYCRR §§ 415.1(a), 420.1(b) (1978). The Court dismisses the significance of the form by noting blandly that a "completed form provides . . . a numerical score corresponding to the physician's assessment of the patient's mental and physical health," and then commenting: "As *petitioners* note, . . . the physicians, and not the forms, make the decision about whether the patient's care is medically necessary. A physician can authorize a patient's admission to a nursing facility despite a 'low' score on the form. See 10 NYCRR §§ 415.1(a)(2), 420.1(b)(2) (1978)." *Ante,* at 1006 (footnote omitted and emphasis added). The Court concludes: "We cannot say that the State, *by requiring completion of a form,* is responsible for the physician's decision."

*Ante,* at 1006–1007 (emphasis added). A closer look at the regulations at issue suggests that petitioners have been less than candid in their characterization of the admission process and the role of the numerical score.

New York's regulations *mandate* that the nursing home operator shall

> "admit a patient *only* on physician's orders *and* in accordance with the patient assessment criteria and standards as promulgated and published by the department (New York State LongTerm Care Placement Form [DMS–1] and New York State Numerical Standards Master Sheet [DMS–9]) . . . which shall include, as a minimum:
>
> "(1) an assessment, performed prior to admission by or on behalf of the agency or person seeking admission for the patient, of the patient's level of care needs *according to the patient assessment criteria and standards promulgated and published by the department.*" 10 NYCRR § 415.1 (1978) (emphasis added).

The details of the DMS–9 Numerical Standards Master Sheet also bear more emphasis than the Court gives them, for that form describes with particularity the patients who are entitled to SNF care, ICF care, or no long-term residential care at all. The DMS–9 provides numerical scores for various resident dysfunctions. For example, if the resident is incontinent with urine often, he receives a score of 20; if seldom, a score of 10; if never, a score of 0. A similar rating is made as to stool incontinence: often, 40; seldom, 20; never, 0. A tabulation is made with respect to "function status." For example, if the resident can walk only with "some help," he receives 35 points; only with "total help," 70 points; if he cannot walk, 105 points. If the resident needs "total help" to dress, he receives 80 points; if "some help" is required, 40 points. Ratings are also made of the patient's "mental status." For example, if the patient is never alert, he receives 40 points; if sometimes alert, 20 points; always alert, 0 points.

If his judgment is always impaired, he receives, 30 points; sometimes, 15 points; never, 0 points. And ratings are also set forth for other physical "impairments." For example, if the patient's vision is unimpaired, he receives 0 points; if he has partial sight, 1 point; if he is blind, 2 points.

The criterion for admission to a SNF is a DMS–9 "predictor score" of 180. 10 NYCRR § 415.1(a)(2) (1978). For admission to an HRF (health-related facility), the required score is 60. § 420.1(b)(2). Where the admission, or denial of admission, is based on the guidelines set forth in these regulations, there is, of course, no doubt, that the State is directly, and solely, "responsible for the specific conduct of which the plaintiff complains," *ante*, at 1004 (emphasis omitted), even if it has chosen to authorize a private party to implement that decision.[8]

---

[8] The Court mistakes the significance of the DMS–1, and the relevant inquiry, when it attempts to characterize that form as merely an instrument for recording the exercise of an independently exercised medical judgment. See *ante*, at 1006, n. 15. Of course, a medical background is essential in filling out the forms. But it remains clear that the State's *standards* are to be applied in making the transfer determination.

The Court concludes that the patient assessment standards prescribed by the State may be easily disregarded. But the regulations themselves clearly demonstrate that those standards are not merely precatory. Notably, the regulations specify that "patient assessment standards shall *not* be applied to residents admitted to the residential health care facility prior to March 1, 1977." 10 NYCRR §§ 416.9(a)(1), 421.13(a)(1) (1980) (emphasis added). See also §§ 416.9(b)(4)(vi), 421.13(b)(4)(vi). If the forms merely recorded the exercise of an independent medical judgment, rather than prescribed the standards upon which that judgment must be exercised, why would it be necessary to exempt certain patients from the inquiry? Indeed, the regulations specifically provide for a *different* set of standards to be applied to the continued stay review of patients admitted to a facility prior to March 1, 1977. See 10 NYCRR §§ 416.9(b)(4)(vii), 421.13 (b)(4) (vii) (1980) ("the standards for residents admitted to the facility prior March 1, 1977 shall be developed by the utilization review agent and approved by the department"). Again, if the determination were in reality based on an independent medical assessment, it seems inconceivable to me that the State would have any interest in requiring different

The Court dismisses the specific state standards for denying admission set forth in the regulations, and tabulated according to the DMS–9, by emphasizing what it perceives as an alternative method for gaining admission to a nursing home. In the Court's view, this alternative route to admission takes the whole scheme outside the realm of state action because it hinges on a "physician's assessment" of what is medically necessary. In characterizing the admission process as the independent assessment of a physician, the Court relies upon, but fails to quote, the following state regulations. The language of those regulations bears noting:

> "[F]or those patients failing to meet the criteria and standards for admission to the . . . facility [as measured by the DMS–9], a certification *signed by a physician member of the transferring facility's utilization review agent or signed by the responsible social services district local medicaid medical director or designee* indicating the reason(s) the patient requires [the facility's level of care, is required]." 10 NYCRR § 415.1(a)(2) (1978) (emphasis added).

See also § 420.1(b)(2).

As this provision makes clear, if the potential resident does *not* qualify under the specific standards of the DMS–1, as tabulated on the DMS–9, the patient can be admitted *only* on the basis of direct approval by Medicaid officials themselves, or on the basis of a determination by the utilization review agent of the transferring facility—and, of course, such agents are themselves clearly part and parcel of the statutory cost-control process.[9] See n. 8, *supra.* No decision is made on

standards for different patients depending on when the patient had been admitted.

[9] Federal regulations require each nursing home to establish a utilization review committee whose functions include review of admission decisions, and the periodic assessment of the resident's condition to determine whether the resident's continued stay in the facility is justified. See 42 CFR §§ 456.301, 456.406 (1981). These review agents, as they are deemed

the basis of a medical judgment exercised outside the regulatory framework, by the resident's personal physician acting on the basis of his personal medical judgment. The attending physician's role is, at this stage, limited to "scoring" the patient's condition according to standards set forth by the State on the DMS–9.

Yet the State's involvement does not end with the initial certification. Within five days *after* admission, the matter is again subjected to assessment, this time by the operator of the transferee facility. This time the transferee nursing home operator is required to tabulate the DMS–9 score. If the patient's score is not adequate by the standards of the DMS–9, admission must be denied unless sanctioned by the facility's utilization review agent.[10] The utilization review agent of the admitting facility, like that of the transferring facility, operates under a "written utilization control plan, approved by the department [of health]." 10 NYCRR §§ 416.9, 421.13 (1980). And that statutory body has the final say in

---

in the New York regulations, are composed of physicians not directly responsible for the patient whose care is being reviewed. §§ 456.306, 456.606. Under New York law, the physicians of the review agent may not have a financial interest in a residential care facility. 10 NYCRR §§ 416.9(b)(2), 421.13(b)(2) (1980). In New York, the review agent generally consists of two or more physicians selected and appointed by the facility. *Medicaid provides reimbursement for their services.* App. 173.

[10] A physician member of the utilization review agent has the power to determine that the patient qualifies for the type of care that the facility offers, even if the patient's score on the DMS–1 is insufficient. 10 NYCRR §§ 416.9(a)(2)(i), 421.13(a)(2)(i) (1980). If that physician member confirms that the patient is not in need of the facility's level of care, he must then notify the patient's attending physician "and afford that physician an opportunity for consultation." § 416.9(a)(2)(ii). But even if the attending physician disagrees with the adverse admission finding of the utilization review agent physician, it is the utilization review agent, not the attending physician, that makes the admission decision. §§ 416.9(a)(2)(iv), 421.13(a)(2)(iv). The utilization review agent must, however, notify "the responsible social services district" of "any adverse admission decision." §§ 416.9(a)(3), 421.13(a)(3).

each instance. There can thus be little doubt that in the vast majority of cases, decisions as to "level of treatment" in the admission process are made according to the *State's* specified criteria. That some deviation from the most literal application of the State's guidelines is permitted cannot change the character of the State's involvement. Indeed, absent such provision for exceptional cases, the formularized approach embodied in the DMS–9 would be unconscionable. And indeed, even with respect to these exceptional cases, the admissions procedure is administered through bodies whose structure and operations conform to state requirements, and whose decisions follow state guidelines—albeit guidelines somewhat more flexible than the DMS–1, in allowing some "psychosocial" factors to be taken into account. See *infra,* this page and 1025–1026.

The Court dismisses all this by noting that "[w]e cannot say that the State, by requiring completion of a form, is responsible for the physician's decision." *Ante,* at 1006–1007. The Court then notes that "[i]n any case, respondents' complaint is about nursing home decisions to discharge or transfer, not to admit, Medicaid patients." *Ante,* at 1007. This is true, of course. But where, one might ask, is the Court's discussion of the frequent utilization reviews that occur *after* admission? The State's regulations require that the operator shall provide for "continued stay reviews . . . to promote efficient and effective use of available health facilities and services *every 30 days for the first 90 days, and every 90 days thereafter,* for each nursing home patient." 10 NYCRR § 416.9(b)(1) (1980) (skilled nursing facilities) (emphasis added). See also § 421.13(b)(1) (health-related facilities, every 90 days).

The continued stay reviews parallel the admission determination with respect to both the State's procedural and substantive standards.[11] Again, the DMS–1 and the DMS–9

---

[11] The Court takes issue with our reliance on the nature of continued stay reviews performed by the utilization review agent, noting that "patient

channel the medical inquiry and function as the principal determinants of the resident's status, for whenever a resident does not achieve an appropriate score on the DMS–1, as determined by a nonphysician representative of the utilization review agent, the resident's case is directed to a physician member. That physician member does not personally examine the resident, but rather relies on the DMS–1 and other documentary information. See App. 172–173. If the matter is resolved adversely to the resident, only then must the attending physician be notified. The attending physician is allowed to present relevant information, though the final decision remains with the utilization review agent. See 10 NYCRR §§ 416.9(b)(2), 421.13(b)(2) (1980). And again, the *State's* substantive standards, not independent medical judgment, pervade review determinations. Evaluations are based only on the DMS–1 and DMS–9 tabulation, on a "psychosocial" evaluation respecting the resident's response to transfer and other physical, emotional, and mental characteristics of the patient, on the resident's discharge plan (prepared according to state regulations), and upon "additional criteria and standards . . . *which shall have been approved*

---

transfers to lower levels of care initiated by utilization review committees are simply not part of this case." *Ante,* at 1007, n. 17. The Court's position with respect to the work of the utilization review committee is schizophrenic at best: The Court expressly relies on its characterization of the review committee's work as representing an independent physician's assessment in reaching its conclusion that the DMS–1 and DMS–9 do not supply the criterion controlling the nursing home operator's decision to admit or retain a patient in the home. *Ante,* at 1006; see discussion *supra,* at 1022. In any event, the Court simply misses the point. The *nursing home operator* is under a continuing duty "to make all efforts possible to transfer patients to the appropriate level of care or home as indicated by the patient's medical condition or needs." 10 NYCRR §§ 416.9(d)(1), 421.13(d)(1) (1980). Whether performed through the utilization review agent, or whether undertaken by the nursing home operator directly, transfers premised on the "patient's medical condition or needs" are to be made with reference to the *State's* definition of "need."

*by the department* [of health]." 10 NYCRR §§ 416.9(b)(4), 421.13(b)(4) (1980) (emphasis added).[12]

The Court concludes with this assessment of the statutory scheme:

> "These regulations do not require the nursing homes to rely on the forms in making discharge or transfer decisions, nor do they demonstrate that the State is responsible for the decision to discharge or transfer particular patients. Those decisions ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State." *Ante,* at 1008.

The Court is wrong. As a fair reading of the relevant regulations makes clear, the State (and Federal Government) have created, and administer, the level system as a cost-saving tool of the Medicaid program. The impetus for this

---

[12] If it is finally determined by the utilization review agent that the patient should be assigned to a lower level of care, the regulations set forth an elaborate scheme of review before the State Department of Health. See 10 NYCRR §§ 416.9(f), 421.13(f) (1980). These provisions apply even when the attending physician concurs in the determination. The utilization review committee must notify the Department of Health of its adverse finding and

"send to the department a written statement setting forth, in specific detail, the changed medical conditions or other circumstances of the individual which support the utilization review agent's decision for transfer, and a copy of the completed patient assessment form (DMS–1) used by the utilization review agent in this review. *The department shall review the adverse continued stay finding.*" §§ 416.9(f)(2)(i), 421.13(f)(2)(i) (emphasis added).

See also §§ 421.13(f)(3)(i), 416.9(f)(3)(i). Of course, there is no doubt that the determinations made on this review represent state action because they are performed by state officials. But if the initial determinations were not made according to state-established standards and for the State's purposes, and were in fact "independent" medical decisions as characterized by the Court, it is difficult to understand the State's active role in reviewing the substance of those determinations.

active program of review imposed upon the nursing home operator is primarily this fiscal concern. The State has set forth precisely the standards upon which the level-of-care determinations are to be made, and has delegated administration of the program to the nursing home operators, rather than assume the burden of administering the program itself. Thus, not only does the program implement the State's fiscal goals, but, to paraphrase the Court, "[t]hese requirements . . . make the State responsible for actual decisions to discharge or transfer particular patients." See *ante*, at 1008, n. 18. Where, as here, a private party acts on behalf of the State to implement state policy, his action is state action.

## II

The deficiency in the Court's analysis is dramatized by its inattention to the special characteristics of the nursing home. Quite apart from the State's specific involvement in the transfer decisions at issue in this case, the nature of the nursing home as an institution, sustained by state and federal funds, and pervasively regulated by the State so as to ensure that it is properly implementing the governmental undertaking to provide assistance to the elderly and disabled that is embodied in the Medicaid program, undercuts the Court's sterile approach to the state action inquiry in this case. The private nursing homes of the Nation exist, and profit, at the sufferance of state and federal Medicaid and Medicare agencies. The degree of interdependence between the State and the nursing home is far more pronounced than it was between the State and the private entity in *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715 (1961). The State subsidizes practically all of the operating and capital costs of the facility, and pays the medical expenses of more than 90% of its residents. And, in setting reimbursement rates, the State generally affords the nursing homes a profit as well. Even more striking is the fact that the residents of those homes are, by definition, utterly dependent on the State for

their support and their placement. For many, the totality of their social network is the nursing home community. Within that environment, the nursing home operator is the immediate authority, the provider of food, clothing, shelter, and health care, and, in every significant respect, the functional equivalent of a State. Cf. *Marsh* v. *Alabama*, 326 U. S. 501 (1946). Surely, in this context we must be especially alert to those situations in which the State "has elected to place its power, property and prestige behind" the actions of the nursing home owner. See *Burton* v. *Wilmington Parking Authority, supra,* at 725.

Yet, whatever might be the status of the nursing home operator where the State has simply left the resident in his charge, while paying for the resident's support and care, it is clear that the State has not simply left nursing home patients to the care of nursing home operators. No one would doubt that nursing homes are "pervasively regulated" by State and Federal Governments; virtually every action by the operator is subject to state oversight. But the question at this stage is not whether the procedures set forth in the state and federal regulatory scheme are sufficient to protect the residents' interests. We are confronted with the question *preliminary* to any Fourteenth Amendment challenge: whether the State has brought its force to bear against the plaintiffs through the office of these private parties. In answering that question we may safely assume that when the State chooses to perform its governmental undertakings through private institutions, and with the aid of private parties, not every action of those private parties is state action. But when the State directs, supports, and encourages those private parties to take specific action, that is state action.

We may hypothesize many decisions of nursing home operators that affect patients, but are not attributable to the State.[13] But with respect to decisions to transfer patients

---

[13] Of course, the nursing home operator's power to make transfer decisions for other than medical reasons is severely limited by regulation. He may only

downward from one level of care to another, if that decision is in any way connected with the statutory review structure set forth above,[14] then there is no doubt that the standard for decision, and impetus for the decision, is the responsibility of the State. Indeed, with respect to the level-of-care determination, the State does everything but pay the nursing home operator a fixed salary. Because the State is clearly responsible for the specific conduct of petitioners about which respondents complain, and because this renders petitioners state actors for purposes of the Fourteenth Amendment, I dissent.

---

discharge or transfer the resident for valid medical reasons, for the welfare of the affected patient or other patients, or for nonpayment. 42 CFR §§ 405.1121(k)(4), 442.311(c) (1981); 10 NYCRR § 414.14(4) (1980).

[14] The issue presented in this case—the issue that the Court decides presents a live controversy—concerns *facility-initiated* discharges or transfers. See *ante,* at 1000. Transfers initiated by the Utilization Review Committee are within the terms of the consent decree entered by the District Court below, and are not before the Court today. These transfers even more clearly show the State's hand in the transfer decision—indeed, it appears that the physicians on the Committees are reimbursed for their services by Medicaid. But there is absolutely no basis upon which to conclude that that decision to transfer a patient to a lower level of care can be made in any meaningful way independently of the state regulatory standards described in text. Of course, we might hypothesize a decision of the resident's personal physician, not premised on the State's view of what constitutes an appropriate level of care for the patient, to remove the patient from the particular facility. In these circumstances, I would agree that the nursing home owner, in simply responding to the personal physician's request, is not a state actor. But it appears to me that the Court's decision sweeps more broadly than that, and clearly reaches transfers based directly upon and arising from the State's procedures and standards.