Linda **MILLER** and Roger **Miller,**
**Plaintiffs-Appellants,**

v.

**HARTWOOD APARTMENTS, LTD.,** et
al., **Defendants-Appellees.**

No. 81–4465
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Oct. 28, 1982.

Willie L. Rose, North MS Rural Legal Services, Lexington, Miss., Leonard McClellan, Oxford, Miss., for plaintiffs-appellants.

Allan P. Bennett, John H. Holloman, III, Jackson, Miss., for defendants-appellees.

Before BROWN, REAVLEY and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The appellants, Linda Miller and Roger Miller, initiated this case on September 2, 1982, by filing a complaint against Hartwood Apartments, Ltd., Hughes Construction Inc., William J. Van Devender and Hughes Management Corporation, [hereinafter "Hartwood"] pursuant to 42 U.S.C. § 1983 and alleging violations of their first, fifth and fourteenth amendment rights. The Millers sought injunctive and monetary relief on the basis of an eviction obtained by the appellees in an Unlawful Entry and Detainer proceeding in state court, and on the basis of surrounding events. Also on September 2, 1981, the Millers filed a motion for a temporary restraining order to bar the execution of the writ of eviction. The TRO application was denied by a United States Magistrate on September 14, 1981. Subsequently, the Millers noticed a motion for preliminary injunction. Pursuant to Fed.R.Civ.P. 65(a)(2), and upon consent of the parties, the District Court, Cox, J., ordered the trial on the merits consolidated with the hearing on the preliminary injunction. At the conclusion of the appellants' case-in-chief, Hartwood moved pursuant to Fed.R.Civ.P. 41(b) to dismiss their claim. The District Court granted this motion and entered a final judgment dismissing the Millers' claim with prejudice. This order was entered on October 13, 1981. We affirm.

Hartwood is a private corporation which owns and operates a Section 8 new construction apartment complex in Durant, Mississippi. The Section 8 housing program involved here is governed by the provisions of 42 U.S.C. § 1437f (1978 & Supp.1981) and 24 C.F.R. § 880, et seq. (1981). The apartments were constructed with a federally-financed insured loan. All of the tenants leased their apartments from Hartwood pursuant to a standard HUD Section 8 new construction lease agreement. Under the Section 8 new construction housing program, the lessors certify prospective tenants to HUD as being eligible for federally-supplemented rental benefits and assess the amount of rent tenants are to pay based upon their respective incomes. The federal government pays the difference between what the tenants pay and the fair market rental value of the apartments. All management and maintenance responsibilities, "including the selection of tenants and determination of tenancy," are contractually assumed by the lessors. 42 U.S.C. § 1437f(e)(2) (Supp.1981).

The Millers are low-income residents of Holmes County, Mississippi, where the apartments are located. They leased a three-bedroom apartment from Hartwood for $312 per month. Because the Millers had no regular income other than SSI benefits, the entire amount was paid by HUD by check to Hartwood each month. Addition-

ally, appellants received from HUD a monthly utility allowance of $9.

Shortly after the Millers moved into their three-bedroom apartment in February 1981, problems began to develop between them and the apartment manager, Patsy Cochran. There is material disagreement as to who was at fault, but, in short, the problems involved the general condition of the apartment and appellants' upkeep of the apartment, unanticipated visits by Ms. Cochran to inspect the condition of the apartment, alleged unruly behavior by the appellants and their children, unauthorized use of natural gas by the appellants, and related problems.

Mrs. Miller began to organize a tenants' rights organization to protest the problems she felt were the fault of the appellees. At some time prior to March 25, 1981, a member of the local Legal Services Corporation office met with Hartwood's agents to voice appellants' complaints about unannounced visits and tampering with their mail. The relations between the Millers and Hartwood continued to deteriorate over the next 3 months, and on July 6, 1981, the appellees sent notice by letter to the Millers advising them that they were in material noncompliance with the terms of the lease, specifying the areas of noncompliance, and advising them that a failure to comply in the future would result in eviction. Further, the letter, conforming to HUD's requirements, informed the Millers that they would have an opportunity to discuss the tenancy problems on July 10.

The informal meeting was never held. According to the appellants, agreement was reached to postpone the meeting. According to appellees, the appellants failed to appear at the meeting. The District Court credited the account by the appellees.

On July 14, 1982, the Millers received a second letter from Hartwood informing them that they continued to be in substantial noncompliance with the terms of the lease and that they could consider their tenancy terminated as of August 15, 1981. The Millers were advised that if they did not vacate before that date, state court eviction proceedings would be instituted against them.

The Millers refused to vacate, and eviction proceedings were initiated in state court. The appellants were served with process but failed to appear, and on September 3, 1981, they were evicted pursuant to an order of the Unlawful Entry and Detainer Court.[1]

In the District Court opinion below, essentially two determinations were made. First, it was held that the doctrine of *res judicata* barred this suit in federal court. Second, as to the § 1983 claim by the appellants that the appellees were acting under color of state law, it was held that this case involved purely federal action and that there was no basis in state action to support a § 1983 claim.

The initial issue to be considered involves the application of *res judicata* or collateral estoppel.[2]

The appellees have argued, and the district court agreed, that the determination in the Unlawful Entry and Detainer Court operates as an absolute bar to any claim that the appellants have in federal court.

As a general rule, the principle of estoppel bars a subsequent decision by the federal court "as to all matters which were litigated or might have been litigated" between the parties in state court. *Jennings v. Caddo Parish School Board,* 531 F.2d 1331 (5th Cir. 1976).

---

1. Unlawful Entry and Detainer Courts in Mississippi comprise three Justice of the Peace judges and are authorized pursuant to Miss. Code Ann. § 11-25--1 *et seq.* (1972).

2. Appellants discuss the bar as involving *res judicata* while the appellees consider it a question of collateral estoppel. As discussed in *Allen v. McCurry,* 449 U.S. 90, 94 n.5, 101 S.Ct. 411, 415 n.5, 66 L.Ed.2d 308 (1980), the Re-

statement of Judgments distinguishes *res judicata* from collateral estoppel as involving "claim preclusion" versus "issue preclusion." Restatement of Judgments (Second) § 74 (tent. draft No. 3, 1976). The doctrines are frequently used interchangeably. In this case, however, because the issue is one of "issue preclusion," the doctrine of collateral estoppel would appear more applicable.

 The key question in this case involves those issues "which might have been litigated." Under the applicable Mississippi law, the role of the Unlawful Entry and Detainer Courts is extremely limited. The Mississippi Supreme Court has held, for example, that equitable defenses are not available in any action in such a court. *Tate v. Tate,* 217 Miss. 734, 64 So.2d 908, 910 (1953). The adjudicatory powers of the Justices of the Peace extend only to the determination of the possessory rights of the parties involved.[3]

Given the limited jurisdictional role of these courts, we cannot find that the constitutional issues raised in the federal court action "might have been litigated" in the state court action.

Moreover, we cannot ignore the supplementary nature of § 1983 actions as discussed in *Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961). This is a classic case wherein the constitutional rights asserted by the appellants underlie the more quotidian rights considered by the state court. To deny the appellants consideration of their constitutional rights would be to "overrule the essence of *Monroe v. Pape.*" *Lombard v. Board of Education,* 502 F.2d 631, 635 (2nd Cir. 1974).[4]

 Despite our determination that the Millers' day in federal court should not have been barred because of the previous action

of the state court, we do find a total absence of any action under color of law, either state or federal, which could support their claim.

As to the Millers' § 1983 claim, there has been no implication of state law. No state officials or state laws are involved in the day-to-day operation of the Hartwood Apartments. The appellants merely make broad assertions of "governmental action" as though that suffices to establish a § 1983 claim. It does not.

Nor is there merit in appellants' argument that the use of the state court process constitutes sufficient state action to support their § 1983 claim. The appellants make no showing of any constitutional infirmity in the state law or procedure under which they were evicted. Nor is there any claim of any conspiracy between the court and the appellees. This claim therefore fails. As was stated in *Hill v. McClellan,* 490 F.2d 859, 860 (5th Cir. 1974):

> There is no cause of action under the Civil Rights Act if a case is private litigation in which the state does no more than furnish the forum and has no interest in the outcome.

We now turn to appellants' claim of federal action.[5] In consonance with the considerations of § 1983 claims, appellants' prayer for relief for alleged violations of their first and fifth amendment rights must stand or

---

**3.** Arguing against the estoppel of their federal court claims, appellants rely on Miss.Code Ann. § 11 25–31 (1972) which provides that:

> A Judgment rendered in a suit of Unlawful Entry or Detainer, either for the plaintiff or defendant, shall not bar any action in the circuit court between the same parties, respecting the same land; nor shall any Judgment given therein be held conclusive of the facts found in any other action between the same parties.

Appellants read this too broadly, however, when they would deny the state court decision any effect. For the purposes of determining possessory rights, which were the only rights adjudicated in the state court proceedings, the courts of Unlawful Entry and Detainer are dispositive. *McKay v. Shaffer,* 202 Miss. 558, 32 So.2d 746, 748 (1947). *See generally,* 35 Am. Jur.2d *Forcible Entry and Detainer* § 49 at 924–25 (1967). As to other matters, such as

questions of title, the decisions of Unlawful Entry and Detainer Courts are not dispositive.

**4.** Although *Monroe* was expressly overturned by *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), as to immunity of a municipality from a § 1983 suit, *Monroe's* discussion of the general principles of § 1983 remedies remains persuasive.

**5.** Appellees argue that appellants heretofore based their claims solely on § 1983 and that they should not be allowed to raise this contention on appeal. *Capps v. Humble Oil & Refining Co.,* 536 F.2d 80, 82 (5th Cir. 1976). Although the record does reflect almost exclusive reliance on § 1983 in the District Court by appellants, the Millers did plead their federal claims and did argue those claims in the District Court, albeit somewhat obtusely. These claims are therefore cognizable.

fall upon a showing that the federal government, by and through Hartwood Apartments, acted to violate their constitutional rights. *Davis v. Village Park II Realty Co.*, 578 F.2d 461, 464 (2d Cir. 1978). In *Roberts v. Cameron-Brown Co.*, 556 F.2d 356, 358 (5th Cir. 1977), in which a low-income mortgagor alleged violations of her fifth amendment due process rights by a private mortgagee participating in a HUD-financed housing program, the court restated the general test: there must be a "sufficient nexus to transform the private mortgagee's act into that of the federal government." *Id.* at 358. The court further held that the federal government must "be involved with the activity that causes the actual injury" and that "it is not enough to show that the government heavily regulates the private company whose activities are challenged." *Id.*

In a recent Supreme Court decision, *Blum v. Yaretsky,* —— U.S. ——, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), the plaintiffs alleged governmental action in the improper discharge of nursing home patients on the basis that the nursing homes were state-regulated. The Court held that because the state regulations did not "dictate the decision to discharge or transfer" a particular patient, state action was not implicated. *Id.,* at ——, 102 S.Ct. at 2789.[6]

Although the *Blum* decision turned on § 1983, we find the determination of federal action to rest on the same general principles as determinations of state action.[7] Viewed in this well-reasoned and often-applied light, we cannot say that the appellees' *connection* with the federal government amounted to a *nexus* sufficient to support the appellants' claim.

As reflected in the governing statute, the lessors in Section 8 new construction housing programs act as private parties. They have sole responsibility for "all ownership, management, and maintenance responsibilities, *including the selection of tenants and determination of tenancy* . . . ." 42 U.S.C. § 1437f(e)(2) (Supp.1981) (emphasis added).[8] Pursuant to the statute and regulations, the

**6.** *See also Taylor v. St. Clair,* 685 F.2d 982 (5th Cir. 1982).

**7.** For example, in *Roberts,* involving federal action, the court applied the reasoning used in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), which involved a § 1983 claim of state action.

**8.** The regulations enacted pursuant to the statute reflect the lessor's control over termination of tenancy, *i.e.,* "the activity" that caused the "actual injury." *Roberts,* 556 F.2d at 358. 24 CFR § 880.607 (1981) reads as follows:

**Termination of tenancy and modification of lease.**
(a) *Applicability.* The provisions of this section apply to all decisions by an owner to terminate the tenancy of a family residing in a unit under Contract during or at the end of the family's lease term.
(b) *Entitlement of Families to Occupancy*
(1) *Grounds.* The owner may not terminate any tenancy except upon the following grounds: (i) Material noncompliance with the lease; (ii) Material failure to carry out obligations under any State landlord and tenant act; or (iii) Other good cause, which may include the refusal of a family to accept an approved modified lease form (see paragraph (d) of this section). No termination by an owner will be valid to the extent it is based upon a lease or a provision of State law permitting termination of a tenancy solely because of expiration of an initial or subsequent renewal term. All terminations must also be in accordance with the provisions of any State and local landlord tenant law and paragraph (c) of this section.
(2) *Notice of Good Cause.* The conduct of a tenant cannot be deemed "other good cause" under paragraph (b)(1)(iii) of this section unless the owner has given the family prior notice that the grounds constitute a basis for termination of tenancy. The notice must be served on the family in the same manner as that provided for termination notices under paragraph (c) of this section and State and local law.
(3) *Material Noncompliance.* The term material noncompliance with the lease includes (i) one or more substantial violations of the lease, or (ii) repeated minor violations of the lease which disrupt the livability of the building adversely, affect the health or safety of any person or the right of any tenant to the quiet enjoyment of the leased premises and related facilities, interfere with the management of the building or have an adverse financial effect on the building. Nonpayment of rent or any other financial obligation due under the lease (including any portion thereof) beyond any grace period permitted under State law will constitute a material noncompliance with the lease. The payment of rent or any other financial obligation due under the lease after the due date but within the

lessor determines and certifies the eligibility of would-be tenants, establishes the level of appropriate government subsidy for each tenant, maintains the apartments, and oversees compliance with lease provisions. Although HUD regulations do establish the broad guidelines with which the Section 8 lessors must comply, the lessors nevertheless operate the housing complexes on a day-to-day basis and are, in all senses of the word, private owners.

If the apartments had been staffed by government-paid personnel, or if the questions of tenancy and eviction were required to be submitted for governmental approval, this could be a different question. Given the private operation of the Hartwood Apartments, however, we cannot say that the appellees' actions were in any way attributable to the federal government. We therefore find that the appellants were not denied their constitutional rights by the federal government and hold that, for the reasons set forth in this opinion, the District Court's dismissal is

AFFIRMED.

grace period permitted under State law will constitute a minor violation.

(c) *Termination Notice.* (1) The owner must give the family a written notice of any proposed termination of tenancy, stating the grounds and that the tenancy is terminated on a specified date and advising the family that it has an opportunity to respond to the owner.

(2) When a termination notice is issued for other good cause (paragraph (b)(1)(iii) of this section), the notice will be effective, and it will so state, at the end of a term and in accordance with the termination provisions of the lease, but in no case earlier than 30 days after receipt by the family of the notice. Where the termination notice is based on material noncompliance with the lease or material failure to carry out obligations under a State landlord and tenant act pursuant to paragraph (b)(1) (i) or (ii) of this section, the time of service must be in accord with the lease and State law.

(3) In any judicial action instituted to evict the family, the owner may not rely on any grounds which are different from the reasons set forth in the notice.

(d) *Modification of Lease Form.* The owner may, with the prior approval of HUD, modify the terms and conditions of the lease form effective at the end of the initial term or a successive term, by serving an appropriate notice on the family, together with the offer of a revised lease or an addendum revising the existing lease. This notice and offer must be received by the family at least 30 days prior to the last date on which the family has the right to terminate the tenancy without being bound by the modified terms and conditions. The family may accept the modified terms and conditions by executing the offered revised lease or addendum, or may reject the modified terms and conditions by giving the owner written notice in accordance with the lease that the family intends to terminate the tenancy. Any increase in rent must in all cases be governed by § 880.609 and other applicable HUD regulations.