**D.L. CROMWELL INVESTMENTS, INC., et al., Plaintiffs,**

v.

**NASD REGULATION, INC., Defendant.**

**No. 01 Civ. 0728(LAK).**

United States District Court, S.D. New York.

Feb. 26, 2001.

Martin P. Russo, Jason M. Ewasko, MPR Law Practice, P.C., Herbert M. Jacobi, New York City, for Plaintiffs.

Terri L. Reicher, Assistant General Counsel, National Association of Securities Dealers, Inc., Washington, DC, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiffs, all targets or subjects of a grand jury investigation in the Eastern District of New York, brought this action for an injunction barring NASD Regulation, Inc. ("Regulation"), the regulatory arm of the National Association of Securities Dealers, Inc. ("NASD"), from compelling the individual plaintiffs to testify in an investigation regarding the issuance and trading of shares in Pallet Management Systems, Inc. ("Pallet"), commencing any proceeding to punish the individual plaintiffs for asserting their privileges against self-incrimination in response to questions relating to Pallet, and misusing federal grand jury materials to further its private disciplinary investigation. The case rests on the premise that Regulation is acting as the agent of federal prosecutors. The Court held an evidentiary hearing on plaintiffs' motion for a preliminary injunction at the conclusion of which it consolidated the trial on the merits with the hearing pursuant to Rule 65(a)(2) and with the consent of the parties.[1] This memorandum opinion contains the Court's findings of fact and conclusions of law.

### Facts

*Parties*

Plaintiff D.L. Cromwell Investments, Inc. ("Cromwell") is a registered securities broker-dealer and a member of the NASD. The four individual plaintiffs all are employed by Cromwell.

Regulation is the regulatory arm of the NASD. Its Division of Enforcement ("DOE") conducts private investigations to ensure compliance with NASD rules and institutes disciplinary proceedings before

---

1. Tr., Feb. 15, 2001 ("Tr."), at 117.

professional hearing officers and regional District Business Conduct Committees ("DBCC") where appropriate. Sanctions imposed as a result of disciplinary proceedings are subject to many layers of review. Decisions of a DBCC may be appealed to the National Adjudicatory Committee ("NAC") of Regulation. NAC decisions in turn are subject to discretionary review by the NASD Board of Governors. Decisions may be reviewed further by the Securities and Exchange Commission,[2] which applies a *de novo* standard. The SEC's decisions in turn are reviewable in the United States Courts of Appeals.[3]

In 1998, Regulation formed a Criminal Assistance Prosecution Unit ("CPAG") within the DOE to provide assistance and advice to federal and state law enforcement authorities investigating securities matters. CPAG consists of one attorney, Bruce Bettigole, and an examiner and an investigator. CPAG staff are assigned to work exclusively in CPAG; they conduct no investigations or other enforcement activities on behalf of Regulation. Mr. Bettigole from time to time is designated a Special Assistant United States Attorney in one or another district to facilitate his cooperation with and participation in law enforcement activities. On occasion, and pursuant to court order, CPAG staff may be given access to grand jury materials pursuant to Federal Rule of Criminal Procedure 6(e). In those cases, CPAG staff members are not to disclose or discuss grand jury material with non-CPAG Regulation staff or, for that matter, with anyone not listed on the Rule 6(e) order. CPAG asserts that it does not use NASD rules to compel firms or associated persons to turn over documents to CPAG for the purpose of passing them on to law enforcement authorities.

Although the professed policy of Regulation with respect to CPAG and the rest of the DOE is one of complete separation of activities, the physical circumstances and administrative arrangements are not consistent with the policy. The head of the CPAG unit reports to a superior who supervises the DOE's investigatory functions as well. He shares a secretary with another lawyer who works on DOE private investigations. The CPAG examiner and investigator each have office cubicles in six-cubicle clusters, the other five occupants of each of which work on DOE investigations. CPAG shares telephone, fax and computer systems with the DOE. It has no locked file cabinets save a file drawer in the desk of the CPAG attorney. In short, the physical circumstances of CPAG and the DOE provide no assurance that confidential material in the hands of CPAG does not come to the attention of DOE investigators or that information concerning DOE investigations does not come to the attention of CPAG personnel. One is left to trust the good faith and judgment of the personnel involved.

*The Hanover Indictment*

Some time ago, a grand jury in the Eastern District of New York returned an indictment entitled *United States v. Cataggio*, a 53–defendant case relating to a firm called Hanover Securities. Mr. Bettigole of CPAG is serving as a Special Assistant United States Attorney in connection with that matter, and CPAG staff are assisting the U.S. Attorney's office. Two of the defendants, Thomas Plamenco and Joel Nazareno, are or were Cromwell brokers.

*The Cromwell Investigations*

In October 1998, the Market Regulation Department at Regulation referred Cromwell to the DOE for investigation.[4] The DOE assigned Scott Smith, an attorney, and John Lang, an examiner, to the matter.[5] Their inquiry related, at least in part, to trading activities in Pallet, and

---

**2.** 15 U.S.C. § 78s(d)(2).

**3.** *Id.* § 78y(a)(1).

**4.** Tr. 80.

**5.** *Id.* at 80–82.

their first step was to seek trading records.[6]

Soon afterward, Pallet and, apparently, Cromwell became subjects of interest to the FBI and the United States Attorney for the Eastern District of New York. On November 16, 1998, the FBI made a written request to CPAG for access to its investigative files regarding Pallet, a request which some CPAG personnel appear to understand to have related to Cromwell.[7] A few days later, Ms. Walters of CPAG responded with a letter granting access and enclosing a number of documents relating to Pallet.[8]

In March 1999, after DOE obtained the Pallet trading records, it conducted an on-site inspection of Cromwell's books and records at its Boca Raton office.[9] Messrs. Smith and Long spent three days there and returned to their offices with Cromwell documents relating to Pallet.[10]

Not long after Messrs. Smith and Long returned from Florida, Mr. Smith received a call from the FBI during which he gave the agent a "general overview" of DOE's investigation and described the documents that had been gathered during the on-site inspection.[11] The agent asked for access to the documents, which resulted in Smith learning of the November 1998 letter from the FBI.[12] Once Smith was satisfied that the FBI had made a formal access request and that DOE had granted it, Long sent the FBI copies of a number of documents relating to Pallet and Cromwell,[13] documents that appear to have been obtained by DOE during its on-site inspection.

By the summer of 2000, matters had moved along. Prosecutors in the Eastern District had located a cooperating witness and, in July 2000, briefed the DOE on what the witness had to say.[14] In addition, the prosecutors and the DOE staff exchange general descriptions of their respective investigations, each learning that both were looking into matters relating to Pallet, albeit for different time periods.[15]

Some time later, the U.S. Attorney's office sought CPAG assistance in preparing an affidavit in support of an application for a warrant to search Cromwell's New York office. Mr. Bettigole assigned Mr. Melley, a CPAG staff member, to the task, and Melley provided the prosecutors with information from Regulation's central registration depository.[16] Following execution of the search warrant on September 7, 2000, Mr. Bettigole and the other of his CPAG subordinates, Ms. Manuel, went to Brooklyn to review the seized documents for the purpose of finding any material that related to Messrs. Nazareno and Plamenco, the defendants in the *Cataggio* case on which they were working.[17] Ms. Manuel returned to Washington with an inventory of what the FBI collected in the search of Cromwell's New York office and copies of some commission runs seized at that time.[18]

In November 2000, the DOE made a number of requests to Cromwell and associates for the production of documents.[19] By letter dated November 17, 2000, counsel for Cromwell and the others responded in part by stating that federal agents had

6. *Id.*

7. DX I, Nov. 16, 1998 letter; *see* Tr. at 19, 40–41, 58.

8. DX I, Nov. 20, 1998 letter.

9. Tr. 80–83.

10. *Id.* at 83–84.

11. *Id.* at 85.

12. *Id.* at 85–86; DX I.

13. DX A.

14. Tr. at 99–101.

15. *Id.*

16. *Id.* at 19–20.

17. *Id.* at 19–21.

18. *Id.* at 70.

19. DX B–C; *see* DX E.

seized many of Cromwell's business records, thus making it impossible to respond to most of the DOE's requests.[20] This prompted Mr. Scott, who was handling the DOE investigation, to request an inventory of the documents that had been seized both from the U.S. Attorney's office and from Cromwell.[21] The U.S. Attorney's office responded that CPAG already had the inventory and, after Cromwell's counsel provided a copy of the inventory that was illegible or difficult to read, one of Mr. Smith's subordinates requested and received a legible copy from CPAG.[22]

Review of the inventory by DOE led to the conclusion that the U.S. Attorney's office had many of the documents that DOE had sought unsuccessfully from Cromwell. DOE staff obtained permission to review the product of the search warrant and, in January 2001, obtained copies of a substantial quantity of seized documents.[23]

In the meantime, in December 2000, prosecutors in the Eastern District obtained the assistance of Mr. Melley of CPAG in preparing a grand jury subpoena requiring an entity named Fiserv to produce trading data regarding Pallet. The subpoena, which was issued by a grand jury separate from the one that was involved with Hanover Securities, permitted the respondent to comply by producing the information to Mr. Melley rather than to the grand jury. Mr. Melley explained that this was done because the subpoenaed information can be supplied electronically to Regulation but cannot be so supplied to the U.S. Attorney's office or the FBI due to computer system differences.[24]

Recently, the DOE served Rule 8210 demands on Cromwell and the individual plaintiffs which purport to require them to submit to on-the-record interviews. As Regulation maintains that it is a private actor, it does not recognize the invocation of the privilege against self-incrimination by persons subject to its regulatory powers. Accordingly, there is a substantial likelihood that the invocation of the privilege by the individual plaintiffs to avoid giving evidence to DOE would result in disciplinary action against them, perhaps ultimately resulting in their permanent bar from the securities industry.

*Plaintiffs' Claims*

The individual plaintiffs contend that the Rule 8210 demands have been issued by Regulation as an agent for the government in order to coerce them into surrendering their privileges against self-incrimination by threatening them with permanent banishment from the securities industry if they decline to testify in the NASD investigation. All plaintiffs contend also that government criminal investigators have shared grand jury materials with Regulation in violation of Rule 6(e).

*Discussion*

*The Rule 8210 Demands*

The individual plaintiffs claim that they are faced with a Hobson's choice. If they invoke their privileges against self-incrimination to avoid testifying in Regulation's ostensibly private investigation, they claim that they will be barred from the securities industry or, at least, subjected to administrative sanctions. If they comply with the Rule 8210 demands, they risk incriminating themselves in the pending grand jury

20. DX D; Tr. at 89.

21. PX 2, ¶¶ 15–16.

Before asking for inventories of the seized documents, Mr. Scott, who had heard that CPAG's Ms. Manuel had gone to Brooklyn to review them, described the nature of the DOE investigation to her and asked her whether she thought that the documents in Brooklyn were pertinent to it. Ms. Manuel referred him to her superior who in turn referred Scott to the U.S. Attorney's office. Tr. at 69–73.

22. *E.g., id.* ¶¶ 17–19; Tr. at 64, 107–08.

23. *Id.* ¶¶ 20–21; PX 2, ¶ 21.

24. PX 4, ¶ 6; Tr. at 60–62; *see also id.* at 36–38.

investigation. This dilemma, they claim, is unlawful because the Rule 8210 demands violate their Fifth Amendment rights.

The Fifth Amendment prohibits only governmental action.[25] The NASD and Regulation are private entities [26] save that Regulation is a state actor with respect to Mr. Bettigole's conduct in his capacity as a special assistant United States Attorney. Hence, even if the individual plaintiffs are being compelled to give evidence against themselves by the threat of NASD sanctions, Regulation's actions raise no Fifth Amendment issue unless it fairly may be said that its actions are fairly attributable to the government.[27] This in turn requires that the government have "exercised coercive power or . . . provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the" government or, at least, that "the private entity has exercised powers that are 'traditionally the exclusive prerogative of the State.' " [28]

There is no direct evidence of such governmental involvement. Indeed, all of the relevant Regulation personnel—i.e., all of those involved with the DOE investigation and every member of CPAG—flatly deny that the Rule 8210 demands are the product of any urging or suggestion by the United States Attorney's office or any other governmental agency. Plaintiffs nevertheless argue the Court should not credit that testimony and should infer that DOE is acting as the cat's paw of the government from a series of circumstances:

- Regulation issued Rule 8210 demands to two of the individual plaintiffs for personal financial records shortly after they and Cromwell received Eastern District grand jury subpoenas.

- In September 2000, during the search of one of Cromwell's offices pursuant to a search warrant, one of the individual plaintiffs expressed a desire to call the NASD to explain why the firm was not answering telephone calls of other market makers. An unidentified FBI agent is said to have stated that "we are working with the NASD—they know exactly what is going on."

- In January 2001, during investigational testimony of another Cromwell employee, the employee was questioned regarding two documents that plaintiffs "believe" were seized by the FBI and surmise were not produced by them to Regulation.

- The Fiserv grand jury subpoena gave the witness the opportunity to respond by delivering responsive documents to Mr. Melley at the NASD Washington office.

- Regulation has refused to adjourn the interviews until the completion of the criminal investigation.

One can appreciate the apprehension felt by those facing parallel civil and criminal investigations and the consequent tendency to draw inferences that perhaps would not be drawn so readily by those whose judgment is not tinged with self interest. One can appreciate also the wisdom of the old saw that sometimes even paranoids have people after them. But plaintiffs would have the Court draw conclusions from these circumstances that simply are unreasonable, especially in light of the uncontroverted explanations offered by Regulation.

**25.** *Corrigan v. Buckley,* 271 U.S. 323, 330, 46 S.Ct. 521, 70 L.Ed. 969 (1926).

**26.** *See, e.g., Desiderio v. National Ass'n of Securities Dealers, Inc.,* 191 F.3d 198, 207 (2d Cir.1999), *cert. denied,* —— U.S. ——, 121 S.Ct. 756, 148 L.Ed.2d 659(2001).

**27.** *Id.* ("A state is responsible for a private decision only where it exercised coercive power or provided significant encouragement.")

**28.** *Blum v. Yaretsky,* 457 U.S. 991, 1004–05, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 353, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).

Regulation has an independent obligation to investigate the matters at issue and is conducting its own investigation. While at first blush it appeared more than curious that a grand jury subpoena permitted compliance by delivery of the documents to Mr. Melley, the fact is that Mr. Melley works in CPAG, is working with the United States Attorney's office on the grand jury investigation, is designated to have access to grand jury materials, and in any case was made the recipient of the documents only because the material subpoenaed was trading records that could be transmitted electronically to him at Regulation but could not be transmitted electronically to the FBI or the United States Attorney because of differences in computer systems.

Similarly, the alleged comment by the FBI agent during the execution of the search warrant, assuming that it was made, was benign given the context. The NASD—specifically CPAG—is working with the FBI on the grand jury investigation. No doubt those CPAG personnel detailed to that matter did know exactly what was going on. But that does not even remotely establish that there is any connection between the Rule 8210 demands and the government. Regulation has submitted extensive proof that its regulatory investigation is being carried out by the DOE, that there is no connection between that investigation and the grand jury investigation, and that the CPAG personnel are, figuratively speaking, "walled off" from the other activities of the DOE. The Court credits that evidence and finds that the Rule 8210 demands are not the product of any government coercion, suggestion or other action. Rather, they are the product of entirely independent action by the DOE staff conducting Regulation's private investigation of Cromwell and the trading in Pallet.

In a final bid to keep his case alive, plaintiffs' counsel referred at trial to cases disqualifying law firms from suing a former client where there is a risk of inappropriate use of the confidences of the former client,[29] an allusion to what now is Canon 4 of the Code of Professional Responsibility and the substantial relationship test employed in its implementation. The substantial relationship test was formulated by Judge Weinfeld in *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.*[30] "to determine whether a lawyer's suit against a former client would risk violation of what is now Canon 4's protection of a client's confidences."[31] Reasoning that inquiry into whether and to what extent a current representation has compromised, or threatens to compromise, the secrecy of confidences of a former client—and thus destroy the very confidences the inquiry is designed to preserve—the Court presumed that confidences are threatened whenever counsel sues a former client on a matter that bears a substantial relationship to the prior representation.[32]

The analogy plaintiffs would draw between this situation and the substantial relationship test is flawed. The hard reality underlying the substantial relationship test is that the adoption of a presumption of abuse of former client confidences is the only manner in which the lawyer's duty to respect those confidences may be enforced without disclosing the very confidences the rule is designed to protect. There is no comparable difficulty here. Judicial inquiry into whether the Rule 8210 requests were the product of government suggestion or coercion did not require the disclosure of any information in which plaintiffs or, for that matter, Regulation had a legitimate interest of confidentiality. Thus, there is no basis whatever for enjoining the Rule 8210 interviews.

**29.** Tr. at 119–20.

**30.** 113 F.Supp. 265 (S.D.N.Y.1953).

**31.** *Glueck v. Jonathan Logan, Inc.,* 653 F.2d 746, 749 (2d Cir.1981).

**32.** 113 F.Supp. at 268–69.

*Grand Jury Secrecy*

Plaintiffs contend that if the Court determines, as it has, that Regulation is not a "state actor" with respect to its regulatory investigation, then there must have been a violation of Criminal Rule 6(e) because Regulation has used two documents seized by the FBI in questioning one of its employees.

There are a good many difficulties with this contention, but there is no need to deal with all of them. It suffices to say only this: there simply is no credible proof that any materials subject to Rule 6(e) have been disclosed to or used by Regulation personnel who have not been authorized by court order to have them. Plaintiffs' case rests on the belief of Cromwell's Ms. Monte that two documents she was shown during her NASD testimony had been seized during the execution of the search warrants and her inability to find a record of having produced those two documents pursuant to any Rule 8210 request. It is entirely likely that she in fact was shown documents seized pursuant to the warrant.[33] But plaintiffs have failed to show that those documents, seized pursuant to the warrant, were "matters occurring before the grand jury" and therefore within the protection of Rule 6(e).[34] As there is no evidence that Ms. Monte was shown any grand jury materials[35] or that any grand jury materials ever were disseminated beyond CPAG personnel authorized by court order to receive them, plaintiffs' Rule 6(e) argument fails.[36]

*Conclusion*

As the foregoing demonstrates, there was a certain amount of contact between and among the government, CPAG and DOE staff concerning Cromwell in a period during which both the U.S. Attorney's office and DOE were conducting investigations of the company. While the Court has found that Regulation's DOE was not an instrumentality of the government in seeking these Rule 8210 interviews and that there was no violation of grand jury secrecy in this case, Regulation may wish to give careful attention to its arrangements concerning assistance to criminal investigations and to the relationships, both physical and administrative, between CPAG and the DOE. The present arrangements left doubt sufficient to require a trial as to the independence of DOE's 8210 requests in this matter, a situation that perhaps could have been avoided by more careful controls.

SO ORDERED.

**33.** *See* PX 2, ¶ 23.

**34.** *See* FED. R. CRIM. P. 6(e)(2). Information obtained independently of a grand jury examination does not come within the secrecy provisions of Rule 6(e) "simply because it may be presented to a grand jury in the future," *see United States v. Eastern Air Lines, Inc.*, 923 F.2d 241, 244 (2d Cir.1991). Accordingly, in ordinary circumstances, information obtained pursuant to a search warrant, at least prior to any presentation of it to a grand jury, is not covered by the Rule. *See In re Grand Jury Subpoena*, 920 F.2d 235, 241–43 (4th Cir. 1990) (information produced by a criminal investigation that parallels but is independent of grand jury investigation not subject to Rule 6(e)); *Anaya v. United States*, 815 F.2d 1373, 1379–80 (10th Cir.1987) (same); *In re Grand Jury Matter*, 682 F.2d 61, 64–65 (3d Cir.1982) (same); *see also In re Grand Jury Subpoena*, 103 F.3d 234, 238, 239 (2d Cir.1996).

**35.** *Id.*

**36.** The foregoing assumes that plaintiffs sued the right party on their claim of a Rule 6(e) violation, which by no means is clear. Given the lack of proof of any violation, however, there is no need to address this issue.