RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0157P (6th Cir.)
File Name: 02a0157p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MICHAEL ROSEN; BARBARA
HUSKEY; EMANUEL MARTIN,
by his next friend Cheryl
Martin; WANDA CAMPBELL;
CONNIE HOILMAN; MARK
HUGHES; JACOB B., by his
next friend Martin B.; JACKIE
BAGGETT; BRENDA CLABO,
and PRADIE TIBBS, on their
own behalf and on behalf of
all others similarly situated,
          *Plaintiffs-Appellees,*

          *v.*

TENNESSEE COMMISSIONER
OF FINANCE AND
ADMINISTRATION,
          *Defendant-Appellant.*

Nos. 01-6324/
6325/6521

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 98-00627—William J. Haynes, Jr., District Judge.

Argued: March 8, 2002

1

Decided and Filed:  May 6, 2002

Before:  KENNEDY and BOGGS, Circuit Judges; and
COFFMAN, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Charles A. Miller, COVINGTON & BURLING, Washington, D.C., for Appellant.  Gordon Bonnyman, Jr., TENNESSEE JUSTICE CENTER, Nashville, Tennessee, for Appellees. **ON BRIEF:** Charles A. Miller, Robert D. Wick, Julie L. B. Johnson, COVINGTON & BURLING, Washington, D.C., Linda A. Ross, Katherine A. Brown, OFFICE OF THE ATTORNEY GENERAL, HEALTH CARE DIVISION, Nashville, Tennessee, for Appellant. Gordon Bonnyman, Jr., Russell J. Overby, Michele M. Johnson, TENNESSEE JUSTICE CENTER, for Appellees.

_____

**OPINION**

_____

BOGGS, Circuit Judge.  The Tennessee Commissioner of Finance and Administration ("the state" or "Tennessee") appeals from two orders of the district court issued as part of an ongoing suit challenging the administration of Tennessee's TennCare program.  The first order, issued on September 14, 2001 ("the September order"), required the state to take various steps to comply with an earlier agreed order issued by the court.  In the second order, issued on October 25, 2001 ("the October order"), the district court entered a preliminary injunction enjoining the state from implementing an

_____

[*]    The Honorable Jennifer B. Coffman, United States District Judge for the Eastern and Western Districts of Kentucky, sitting by designation.

even by agreeing to an agreed order.  Accordingly, we hold that the plaintiffs lacked standing to challenge the implementation of the October 1 rule.

**IV**

For the foregoing reasons, we AFFIRM the district court's September 14, 2001 order, but VACATE its October 25, 2001 order.

*Berger* can also be distinguished from the present case by the fact that the plaintiff in *Berger* appears to have shown that the government's alleged violation of the consent decree posed an imminent threat of injury to him personally, whereas the plaintiffs in the present case have not. In both the plaintiffs' amended complaint and the brief the plaintiffs filed in the district court supporting their motion for a temporary restraining order barring implementation of the rule, the plaintiffs made two claims about the rule. First, they claimed that by closing future enrollment to uninsurables, the state was violating the agreed order, which contemplated the state operating the TennCare program under the rules and terms as they existed at the time of the agreed order. Second, the plaintiffs claimed that the state's promulgation of the rule violated a Medicaid regulation completely removed from the parties' agreement, which requires that significant changes in state Medicaid programs be submitted to the non-binding review of a Medical Care Advisory Committee. Nowhere did the plaintiffs in the present case allege to the district court that they would be injured by the alleged breach of the agreed order. Neither of their claims are focused on the injury suffered by the named plaintiffs arising out of the state's alleged breach of their agreement. Indeed, one of the challenges does not even allege a violation of the court's orders in the case, and the challenge that does is solely focused on the effect the rule will have on future uninsured applicants. If the plaintiffs' new claims challenging the October 1 rule fairly alleged injuries the named plaintiffs would experience as a result of an alleged breach of their agreed order, this court would have to consider the question of whether a breach that facially affects only other persons is sufficient to confer standing. However, in the present case, rather than asserting that they "personally ha[ve] suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone*, 441 U.S. at 99, the named plaintiffs seek to carry on a fight on behalf of others. This is exactly what Article III standing will not permit. Parties cannot confer standing purely by agreement,

amendment to the TennCare program relating to eligibility, requiring the state to undertake an expedited reverification process to remove from the TennCare rolls individuals no longer eligible for participation, and appointing a special master to ensure state compliance with the court's order. The state brought these challenges as three separate appeals, which this court has consolidated for the purpose of decision. For the reasons that follow, we affirm the district court's September order but vacate its October order.

## I

The TennCare program is a demonstration project under which the federal Center for Medicare and Medicaid Services ("CMS") (formerly the Health Care Financing Administration, or "HCFA") waived certain sections of the Social Security Act and the state, effective January 1, 1994, replaced its traditional Medicaid program with one that serves expanded classes of individuals. As authorized by CMS, TennCare served: (1) individuals who would have qualified to participate in Tennessee's traditional Medicaid program; (2) individuals who are "uninsured," or those without government or employer-sponsored insurance;[1] and (3) "uninsurable" individuals, *i.e.*, those suffering from pre-existing conditions that preclude them from getting private health insurance. Those who would be eligible for traditional Medicaid are enrolled in TennCare free of charge, while uninsured and uninsurable individuals pay a monthly premium based on family income.

---

[1]Pursuant to permission granted by the CMS to amend the federal waiver governing TennCare, the state ceased accepting applications from uninsured individuals in 1995. However, those individuals already enrolled in the program retained their coverage.

### A.    Case Background

The suit forming the basis for the court's orders was filed in July 1998 by ten current and former enrollees in TennCare, representing a class consisting of "present and future TennCare applicants and beneficiaries who are eligible for TennCare coverage under the federal waiver, rather than under traditional Medicaid eligibility rules" (uninsured and uninsurable individuals), who alleged that the notice and hearing procedures used by the state in making TennCare eligibility determinations failed to comply with due process of law. Rather than litigate the issues, the state entered into negotiation with the plaintiffs; this has resulted in the district court entering several agreed orders.

Early on in the litigation, the plaintiffs applied for, and the district court granted, a preliminary injunction ordering the state to reinstate all members of the plaintiff class who had been denied TennCare coverage without receiving due process of law. The state sought to comply with that injunction and in an agreed order entered on September 13, 1999, the court approved the procedures for a reinstatement scheme agreed to by the parties. The state agreed to identify all uninsureds and uninsurables who had been terminated and send them notices offering re-enrollment to those who replied. Those who did not respond were to receive a second notice.

In April 2000, the plaintiffs filed a renewed motion for injunctive relief, again arguing that the state's procedures for terminating individuals from TennCare did not comply with due process requirements. The district court entered a temporary restraining order prohibiting the state from terminating the coverage of any member of the plaintiff class without first providing notice and a hearing. The temporary restraining order was extended several times by agreed order while the parties negotiated. The court held a hearing in October 2000 on motions for contempt and imposition of sanctions filed by the plaintiffs against the state; however, the

plaintiff and others like him, and (2) to adopt an agreed-to interpretation of the requirements for SSI coverage. When the plaintiff later sought to enforce the agreement, alleging that the government was not using the agreed-to interpretation, the Second Circuit considered whether he had standing to sue. The court held that he had standing in two respects. First, he had shown a sufficient threat of personal injury to justify standing, because his *continued* eligibility was dependent upon the interpretation of the SSI requirements used by the government. Second, the court held that he had an independent basis for standing arising out of the fact that he was challenging non-compliance with a provision in a consent decree to which he was a party. Noting that consent decrees are judicially treated as contracts, the Second Circuit explained that under New York law, "a promisee for the benefit of third parties may enforce the promise on behalf of the third parties." *Id.* at 1564. Accordingly, since Berger was a promisee of the provision of the consent decree he sought to enforce, he had standing to sue for enforcement of it even independent of the effect the provision's enforcement would have on him. In effect, he could sue to enforce the "contract" on behalf of the third-party beneficiaries. *Id.* at 1565.

*Berger* has not been cited by any circuit for the proposition that a breach of an agreement, without more, can serve to confer standing on a party to the agreement. However, to the extent that the *Berger* court held such, we disagree. The Supreme Court has repeatedly held that to have standing in federal court, a party "must assert his own legal interests, rather than those of third parties." *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 100 (1979); *see also Arlington Heights*, 429 U.S. at 263 ("In the ordinary case, a party is denied standing to assert the rights of third persons."). Therefore, the plaintiffs in the present case can not sue to enforce the rights of the unnamed class members *for the unnamed members' sake*; if at all, the plaintiffs can only sue to enforce their own rights as parties to the agreed order.

the named plaintiffs – i.e., an immediate threat of one or more of them being removed from the TennCare rolls such that the October 1 rule would affect them – it is impossible for this court to hold that the threat posed to the named plaintiffs by the operation of the October 1 rule is anything other than "conjectural" and "hypothetical." *Id.*

We reject the plaintiffs' final argument for standing for substantially the same reason. The Plaintiffs argue that having negotiated and agreed to the settlement agreement and agreed order, they have an independent basis for standing to challenge the October 1 rule as a breach of that agreement. On this theory, the "injury in fact" required to confer standing is not the effect the October 1 rule would have on future TennCare applicants, but the fact that the named plaintiffs allege that the rule violates the agreed order to which they are parties. The district court approved of this basis for standing; however, we hold that it erred in doing so.

We note that this argument has some appeal. After all, as both the plaintiffs and the district court pointed out, this court has repeatedly described a consent decree as "a contract founded on the agreement of the parties." *Vogel v. City of Cincinnati*, 959 F.2d 594, 598 (6th Cir.), *cert. denied,* 506 U.S. 827 (1992); *see also Dotson v. United States Dep't of Housing and Urban Development*, 731 F.2d 313, 318 (6th Cir. 1984) ("A consent decree . . . is . . . a contract that has been negotiated by the parties"). So it is not implausible that an alleged breach of that agreement alone could injure the named plaintiffs and thus confer standing upon them.

A decision of the Second Circuit can be read to support this proposition. In *Berger v. Heckler*, 771 F.2d 1556 (2d Cir. 1985), the plaintiff, a resident alien who received Supplemental Security Income (SSI) benefits, sued the federal government challenging the government's interpretation of the requirements for SSI eligibility. As part of a consent decree, the government agreed (1) to provide benefits to the

parties asked the court to withhold its ruling on these matters as negotiations continued.

The parties finally reached a settlement agreement, which came to be embodied in an agreed order entered by the district court on March 12, 2001 (the "agreed order"). The agreed order provides that the state is to follow the Medicaid notice and hearing procedures set out in 42 C.F.R. Part 431, Subpart E when terminating or denying applications for enrollment in TennCare. Further, the state agreed to offer an opportunity to reapply or appeal for reinstatement in TennCare[2] to class members whose coverage was terminated on or after July 11, 1998. The class members were to be given 60 days to reapply or appeal their termination after receiving notice of their right to do so. In exchange, the plaintiffs withdrew their still-pending motions for contempt and sanctions.

### B.   The September Order

In July 2001, the plaintiffs filed a motion to enforce the agreed order, arguing that the state was violating it in two respects. First, the plaintiffs argued that the state was violating the agreed order by applying a TennCare rule providing that individuals who were terminated for failure to pay their premiums must pay all past due premiums in full before they can be reinstated. Second, the plaintiffs alleged that the state continued to deny due process to members of the plaintiff class who were uninsurable by virtue of being severely and persistently mentally ill (SPMI) adults or severely emotionally disturbed (SED) children by failing to ensure that local mental heath facilities were able to provide

---

[2] The order states that the former enrollees may choose whether to reapply for prospective TennCare coverage or appeal for reinstatement retroactive to their date of termination, subject to the requirements for retroactive coverage that the former enrollee establish eligibility as of the earlier date and pay any premiums incurred between the earlier date and the end of the period for which coverage is sought.

guidance to these individuals on how to apply for TennCare and by utilizing applications and denial letters that provided inadequate notice of TennCare coverage for the mentally ill and the reasons for denial.

After an evidentiary hearing, the district court entered an order awarding the plaintiffs relief on both of these grounds. In its order dated September 14, 2001, the court required the state (a) to permit members of the plaintiff class to re-enroll in TennCare without paying past due premiums in advance, and (b) to devise proper notices and ensure that local mental health centers are able to provide guidance on how to apply to TennCare.   In the first of the appeals before us, the state argues that neither of these actions are required by the parties' agreed order, and that the court's order requiring them therefore erroneously expands the agreed order.

## C.   The October Order

At a chambers conference on September 27, 2001, the state informed the court and counsel for the plaintiffs that the next day it would issue a rule making changes in the TennCare program that would take effect October 1, 2001 (the "October 1 rule").

The state had requested and received from CMS an amendment to the federal waiver controlling the TennCare program that would permit the state to close TennCare to adult uninsurables.[3]   The amendment would not affect those adult uninsurables who were either enrolled in TennCare or had submitted applications for enrollment prior to October 1,

---

[3]According to the state, it had to adopt the amendment because projected spending through the end of fiscal year 2001 (June 2002) exceeded both state appropriations and the federal spending cap imposed by the federal waiver.  In addition, the number of individuals enrolled in TennCare was approaching the enrollment cap set by the federal waiver.

2002) (quoting *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 833 (6th Cir. 2001)); *see also Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (plaintiff once subject to police brutality lacked standing to seek injunctive relief without showing that he was in imminent danger of future brutality).

Indeed, in a context very similar to the present case, the Seventh Circuit, in a challenge to the income eligibility standards of a welfare program, held that a named class plaintiff's assertion that her income – which qualified her for financial assistance at the time of the suit – might change and leave her no longer eligible was "insufficient to constitute an injury-in-fact, threatened or actual, within the meaning of Article III." *Foster v. Center Township of La Porte County*, 798 F.2d 237, 242 (7th Cir. 1986).

This is not to say that plaintiffs facing very real and certain threat of future harm must wait for the realization of that harm to bring suit.  Indeed, the Supreme Court has held explicitly that they need not. *See Blum v. Yaretsky*, 457 U.S. 991, 1001 (1982) ("[one] does not have to await the consummation of threatened injury to obtain preventive relief." (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923) (internal quotations omitted))).  However, that future threat must be – like all allegations of injury sufficient to confer Article III standing – "real and immediate," not "conjectural or hypothetical." *O'Shea v. Littleton*, 414 U.S. 488, 493-94 (1974).

A review of the plaintiffs' amended complaint challenging the October 1 rule and their motion for a temporary restraining order to block implementation of the rule reveals that both focus solely on the plaintiff class members who are not presently members of TennCare; nowhere in these filings do the named plaintiffs claim that the rule will affect *them*. As explained above, it is the plaintiff's burden to demonstrate the bases for standing.   Without the benefit of specific allegations as to how there is an imminent threat of injury to

Indeed, the Supreme Court case that the plaintiffs cite to support their position does not do so. In *County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991), the Court recognized that the fact that the named plaintiffs' individual claims had later been rendered moot did not affect the class action they began. However, in that case, the Court specifically pointed out that the plaintiffs had a personal stake at the time they filed their second amended complaint making the claim in question. *Ibid.* Therefore, unless the named plaintiffs can show how one or more of them have a personal stake in the enforcement of the October 1 rule, they lack standing to challenge it.

The plaintiffs attempt to do so by arguing that, although they are not currently uninsurables seeking TennCare coverage after October 1, they easily could become so if their coverage lapses in the future. The named plaintiffs point out that they are all individuals with chronic illnesses, and they allege that they have shown throughout the course of the district court proceedings that lapses in coverage frequently occur for various reasons under TennCare. Since they allege that they will potentially be affected by the October 1 rule in the future, the named plaintiffs argue that they have the requisite personal stake in its implementation now. The district court agreed that this was a sufficient basis for standing to challenge the October 1 rule; however, the district court erred in this regard.

It is clearly established that "[a]llegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be certainly impending to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (internal quotations omitted). Further, this court has recently held that "while past illegal conduct might constitute evidence . . . regarding whether there is a real and immediate threat of repeated injury, 'where the threat of repeated injury is speculative or tenuous, there is no standing to seek injunctive relief.'" *Blakely v. United States*, 276 F.3d 853, 873 (6th Cir.

2001. The amendment also would not affect children or those who would be eligible for traditional Medicaid.

The plaintiffs sought and obtained a temporary restraining order barring implementation of the rule. Then, after a two-day evidentiary hearing, the district court on October 25, 2001 issued a preliminary injunction against the October 1 rule. In addition to enjoining implementation of the rule, the district court ordered that the state undertake changes in its reverification process, the process by which the state verifies that TennCare enrollees continue to meet the program's eligibility requirements. Specifically, the court ordered that the state adopt an expedited reverification process in order to alleviate the spending and enrollment cap pressures the state was experiencing. To ensure compliance with its order, the court decided to appoint a special master to oversee the reverification process. In the second and third appeals consolidated by this court, the state challenges the district court's preliminary injunction of the October 1 rule, its ordered changes to the state's reverification process and its appointment of a special master to oversee the process.

## II

With respect to the district court's September order, Tennessee argues that the court impermissibly expanded the scope of the parties' agreed order in deciding each of the issues before it. We disagree and uphold the district court's September order on both issues.

A.   *The court's order that the state permit members of the plaintiff class to re-enroll in TennCare without paying past due premiums in advance*

As discussed above, the plaintiffs instituted the action that gave rise to the presently disputed orders in order to challenge the procedural sufficiency of the notice and hearing procedures utilized by the state to terminate, reduce, or

suspend TennCare coverage and to deny initial applications for coverage. As also discussed above, the parties eventually reached a settlement that disposed of the plaintiffs' claims and was embodied in the agreed order entered by the district court in March 2001.

In relevant part, the state agreed to use federal Medicaid notice and hearing procedures when terminating or denying applications for enrollment in TennCare, and it agreed to offer an opportunity to reapply or appeal for reinstatement to TennCare to class members whose coverage was terminated on or after July 11, 1998. However, the order makes clear that, with the exception that uninsured adults will be eligible for enrollment,[4] TennCare eligibility rules were to apply to the applications. Therefore, as the order states, "[i]f the applicant for reinstatement is not currently eligible (except that closure of enrollment to uninsured adults will be waived), reinstatement will be denied in conformity with the procedural safeguards [agreed to in the order]."

In instituting the agreed-to reapplication scheme, the state applied a TennCare rule regarding the payment of back premiums that states:

> A TennCare enrollee who is not eligible for Medicaid and who is disenrolled due to failure to pay the required premiums shall be required to pay all unpaid premiums in order to be re-enrolled in TennCare.

Tenn. Rules 1200-13-12-.03(3)(a). As the parties stipulated to the district court, this rule operates to draw a distinction between enrollees who are in arrears in paying their premiums and those who have been disenrolled because of non-payment. As long as the individual is still enrolled in

---

[4] As noted above, the state stopped accepting applications from uninsured individuals in 1995. However, that restriction was temporarily waived for class members, pursuant to the agreed order.

of course a finding that the named plaintiffs did have a stake), then a loss of personal stake by the named plaintiffs down the road does not necessarily lead to loss of the ability to prosecute the suit on behalf of unnamed plaintiffs who continue to have such a stake. *See Sosna v. Iowa*, 419 U.S. 393, 399 (1975) ("When the District Court certified the propriety of the class action, the class of unnamed persons described in the certification acquired a legal status separate from the interest asserted by appellant.").

However, in the present case, the October 1 rule was not a part of the initial lawsuit. The plaintiffs sought leave to amend their complaint on September 28, 2001 to add a claim challenging the October 1 rule. It is black-letter law that standing is a claim-by-claim issue. *See, e.g., Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("standing is not dispensed in gross"); *James v. City of Dallas*, 254 F.3d 551, 563 (5th Cir. 2001) ("Both standing and class certification must be addressed on a claim-by-claim basis"). The insertion of a new claim in the case makes this situation more like certain routine class certification cases, where named plaintiffs are certified as class representatives to go forward with claims in which they do have a personal stake, while those in which they do not have such a stake are dismissed without prejudice. *See Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) (in the context of a class action, the Court held that it is not true that "a plaintiff who has been subject to injurious conduct of one kind possess[es] by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."). *See also, e.g., Vuyanich v. Republic Nat'l Bank*, 723 F.2d 1195, 1200-01 (5th Cir. 1984) (some claims in class action plaintiffs' complaint arose out of employment practices that did not apply to the named plaintiffs and were therefore not allowed, while the named plaintiffs were allowed to continue with the claims in which they did have standing).

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations and citations omitted). The burden of establishing standing is on the party seeking federal court action. *Id.* at 561-62. Therefore, that party must "clearly and specifically set forth facts sufficient to satisfy those Article III standing requirements." 15 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 101.31 (3d ed. 2001). In the present case, we are concerned with whether or not the plaintiffs have borne their burden of establishing the first of the *Lujan* requirements – that they set forth a concrete and particularized, actual, or imminent injury that will befall them if the October 1 rule is implemented.

The named plaintiffs first argue that they need not assert that the October 1 rule will injure any of them *personally*, as they represent a class of "present and future TennCare applicants and beneficiaries" and they have asserted – indeed the state has freely admitted – that it will directly affect future uninsurable TennCare applicants. However, the plaintiffs are incorrect in this regard.

It is well settled that, at the outset of litigation, class representatives without personal standing cannot predicate standing on injuries suffered by members of the class but which they themselves have not or will not suffer. *Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("the plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.").

The plaintiffs assert that this situation is different, because the class has already been certified by the court and found to have standing. The plaintiffs argue that because of this, they can represent the interests of other members of the class on an issue in which they might not otherwise have the requisite personal stake.

This contention is certainly true with respect to claims originally part of the action. If a class is certified (requiring

TennCare, he or she may arrange an installment plan to pay the arrears, while still retaining TennCare coverage. However, once a person's coverage is terminated for failure to pay, he or she must pay the entire arrearage before he or she is eligible for reinstatement into the program. As the district court pointed out, since premiums are set on a sliding scale corresponding with an enrollee's income, the requirement that a former enrollee pay in one lump sum several times the monthly premium amount that is set according to their monthly income poses a significant barrier to re-enrollment.

The plaintiffs, in their motion to enforce the agreed order, contended that the state's application of this rule operated to foreclose completely any meaningful remedy to class members who the plaintiffs allege were originally disenrolled in violation of their due process rights. In other words, but for the due process violations the plaintiffs allege, the former enrollees would still be enrolled in TennCare and therefore would have the opportunity to pay their arrearage on a pro rata basis. Therefore, the plaintiffs argued that the class members should be given the opportunity to reapply and pay their arrearage in this way, rather than having to pay the sum in advance.

The district court agreed with the plaintiffs. It noted that the agreed order is essentially a consent decree and that consent decrees are subject to ongoing judicial review and "must be construed to preserve the position for which the parties bargained." *Grand Traverse Band of Ottawa and Chippewa Indians v. Director, Michigan Dep't of Natural Res.*, 141 F.3d 635, 641 (6th Cir. 1998) (internal quotations omitted).

The court held that in order to preserve the positions bargained for by the parties, the state must be precluded from applying its full payment rule to class members seeking reenrollment who had been disenrolled for failure to pay their

10   *Rosen, et al. v. Tennessee*   Nos. 01-6324/6325/6521
    *Commissioner of Finance*
    *and Administration*

premiums. The court noted that in a letter describing the State's payment policy to an attorney representing affected individuals in applying for TennCare, the state assistant general counsel wrote that the rule applied "if an individual was previously terminated by TennCare for failure to pay premiums *and was afforded due process regarding the termination.*" (emphasis added). The court went on to note that while it had not adjudicated the matter of whether the class members had in fact been denied due process, the purpose of the agreed order was clearly to provide for reinstatement to those who had allegedly been so mistreated. The policy, the court noted, was intended to apply to those who had been given due process. Accordingly, the court held that the policy should not be applied to class members disenrolled for non-payment. The court went on to note that since the former enrollees are necessarily either those with limited or moderate means, the requirement that they pay in advance several times the monthly premium explicitly set to correspond with their monthly income would serve to render ineffective the remedy the plaintiffs bargained for. Further, finding that the state could still achieve payment of the arrearages using a pro rata payment policy, the court held that it must do so.

The state's argument that this holding was incorrect misses the mark. The state argues that the terms of the agreed order expressly state that former enrollees should be reenrolled *only if they are "currently eligible,"* with the one exception that uninsured individuals will be permitted to apply. According to the state, the court contravened the agreed order by effectively reinterpreting it to permit another exception – that class members who have been disenrolled for non-payment of premiums need not follow the usual rule for reapplication. In doing so, according to the state, the district court modified or impermissibly expanded the agreed order beyond its terms.

The state's argument would be sound had the court ordered use of the pro rata payment rule in direct contravention of the

Nos. 01-6324/6325/6521   *Rosen, et al. v. Tennessee*   15
    *Commissioner of Finance*
    *and Administration*

### A. Standing

Before this court can reach the merits of the court's October order, we must first address the threshold question – raised by the state both in the district court and on appeal – of whether the plaintiffs in this case have standing to challenge the implementation of the October 1 rule. We hold that they do not.

The state argued before the district court that none of the named plaintiffs had the required personal stake in litigation against the October 1 rule, because the rule would only affect adult uninsurables who apply for TennCare after October 1, 2001. None of the named plaintiffs applied after that date or alleged that they would. Further, the state argued that the named plaintiffs can not sue on behalf of unnamed class members if they lack standing on their own.

The district court rejected the state's arguments and held that the class had standing to challenge the October 1 rule because the rule would affect future applicants who were members of the class. Further, the court held that the class representatives had an independent basis for standing to enforce and secure the settlement agreement they had negotiated and agreed to.

The Supreme Court has set up three requirements for standing:

First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent . . . . Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

individuals' applications to TennCare. The facilitation of applications, the state argues, is not covered by the agreed order.

We reject the state's argument on this issue. It was the state itself that designed the application process – referring potentially mentally ill individuals to community health centers for assessment by standard test and having those centers forward the results on to the bodies that make the final determination based on the results of the test. Although it appears there are alternative routes by which the mentally ill may apply for coverage, the state has made the community health centers the first step in the official application process for many uninsurables who want to take advantage of the exemption from the requirement that they provide a "turn-down letter." Since misinformation from these centers (to whom the state itself refers individuals in order to apply for TennCare) or a lack of knowledge on the part of the centers' staff can very easily constitute a de facto denial of TennCare coverage, it only makes sense that the agreed order – in which the state agreed to provide procedural due process in denying applicants – should cover these centers. We therefore uphold the district court's September order.

### III

In the second and third appeals before us, Tennessee challenges the district court's October order, in which the court enjoined implementation of the October 1 rule closing TennCare enrollment to future uninsurable applicants and ordered the state to revamp its reverification process – under the oversight of a special master – in order to alleviate the enrollment and expenditure cap pressure that the state contended made the rule necessary.

terms of the agreed order. Case law makes clear that "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984). *See also United States v. Int'l Bhd. of Teamsters*, 998 F.2d 1101, 1107 (2d Cir. 1993) ("A court may not replace the terms of a consent decree with its own, no matter how much of an improvement it would make in effectuating the decree's goals.").

There is some language in the district court's opinion that might support a view that the court had effected a *sub silentio* reformation of the agreed order in the interests of equity. However, the better reading is that the court held that the full payment rule did not apply to the former enrollees who were to be offered the chance to reapply for TennCare coverage by the agreed order. As mentioned above, the court cites (and the state does not contest the reference to) the letter written by the state assistant general counsel, to the effect that the full payment rule applies to former enrollees whose coverage was terminated for non-payment *and who were "afforded due process regarding the termination."* (emphasis added). The court sensibly read this to mean that the full payment policy only applied to former enrollees who had been afforded due process.

Though noting that because of the parties' settlement the court had not had the opportunity to adjudicate on the merits whether the former enrollees in question had in fact been denied their due process rights, the court stated that the agreed order addressed those who had allegedly been denied such process. It was therefore far from clear that the enrollees in question *had* been afforded due process, and it was in this vein that the court wrote, "[t]hus, from the Court's view, the policy should not apply to class members covered by the Agreed Order." This statement suggests that – rather than impermissibly reforming or somehow expanding the agreed order – what the district court did was issue an order declaring

that the policy sought to be applied by the state was simply inapplicable. Given the plaintiffs' contention that the affected individuals would have been current TennCare enrollees and therefore eligible for pro rata arrearage payment but for the state's violation of their due process rights, and the state's decision to forgo judicial determination of that issue by entering into the agreed order, this is within the ambit of ongoing judicial enforcement of the agreed order.

B.   *The court's order that the state create notices and written protocols for local mental health facilities*

Agreeing with the plaintiffs' arguments, the district court held in its September order that the state continued to deny due process to SPMIs and SEDs in several ways. First, the district court held that the state's TennCare application forms were insufficient, in that they did not adequately inform SPMIs and SEDs of special application procedures available to the mentally ill. The court also held that the state's denial notices were faulty, in that they did not adequately set forth reasons for denial or cite legal authority supporting denial and thereby precluded meaningful appeals. Further, the district court cited as problematic the lack of a written protocol for community health centers to follow in performing their role as facilitators and conduits for the TennCare applications of the mentally ill. The state does not raise a challenge to the first part of the court's order, requiring more effective notice of application procedures to SPMIs/SEDs and better explanation in the denial letter. However, the state argues that the court's order requiring the state to develop a protocol for community health centers impermissibly expands the scope of the parties' agreed order.

Ordinarily, for an individual to apply for TennCare as uninsurable, he must provide a "turn-down letter," a letter from a commercial insurance company denying his application for coverage because of a pre-existing medical condition. However, due to the nature and effects of mental illness, the state has promulgated a special procedure for individuals who are certified as either an SPMI or an SED. These individuals need not submit a turn-down letter, but are instead presumed uninsurable once certified as being in one of these two groups.

In the state-designed process for SPMI/SED applications, these individuals are often referred to community health centers that make the determination that an individual is either an SPMI or an SED. The centers use a standard diagnostic instrument and scoring algorithm to classify an individual into these groups and then report the results to the Tennessee Department of Mental Health and Developmental Disabilities, which certifies the results to the Tennessee TennCare Bureau, which in turn makes the final determination of eligibility. In their motion and at the evidentiary hearing on the motion, the plaintiffs sought to show that the state was referring people to apply through the community health centers but had not provided the centers with sufficient information about the program or their role in the application process. The effect, according to the plaintiffs, was that SPMI/SED individuals would go to the community health centers, receive incorrect information, and subsequently be denied TennCare coverage or not know to apply. Though the court pointed out that the plaintiffs had not adduced evidence that this had actually happened in any cases, the court was concerned that it easily could happen and discussed the need for a written protocol to inform the centers and avoid this.

The state's argument is that by ordering it to provide a protocol to the community health centers to inform them about the SPMI/SED application process, the court improperly expanded the parties' agreed order, because the agreed order only discusses providing procedural due process in the TennCare eligibility process (the process by which applicants are either admitted or denied). The community health centers, on the other hand, merely facilitate